213 So.2d 340 (1968)
Gurthie A. MAYES, and Charlie G. GARNER, Plaintiffs-Appellees,
v.
Jessie J. McKEITHEN et al., Defendants-Appellants.
Nos. 7369-7370.
Court of Appeal of Louisiana, First Circuit.
July 1, 1968.
Rehearing Denied August 26, 1968.
*341 Gerald L. Walter, Jr., of Kantrow, Spaht, Weaver & Walter, Baton Rouge, Vinson M. Mouser, Columbia, for defendants-appellants.
J. Minos Simon, Lafayette, for plaintiffsappellees.
Before LOTTINGER, SARTAIN and ELLIS, JJ.
SARTAIN, Judge.
These are two actions for the alleged wrongful death of Peggy Ann Garner (18) and Charlene Garner (13) minor daughters of a prior marriage between plaintiffsappellees, Mrs. Gurthie A. Mayes and Charles G. Garner. The defendants are Jessie J. McKeithen and Hartford Accident and Indemnity Company, public liability insurer of the McKeithen vehicle.
Trial was had in the district court before a jury which rendered a verdict in favor of plaintiffs in the amount of $100,000 for Mrs. Mayes and $50,000 for Mr. Garner. The trial judge rendered judgment in accordance with the jury's verdict from which judgment the defendants prosecute this appeal.
The accident giving rise to this litigation occurred between 10:50 and 11:00 o'clock P.M. in Caldwell Parish on U.S. Highway 165 approximately one mile north of Columbia, Louisiana. The weather was not a factor.
At the scene of the accident, Highway 165 runs generally in a north-south direction. As one proceeds south the highway curves to the traveler's right. As one proceeds north the highway curves to the traveler's left. The curve is banked, slanting east to west, with the east edge elevated two feet higher than the west edge. High way 165 consists of two twelve foot lanes and is paralleled by asphalt shoulders. The roadbed gradually slopes downward from the outer edges of the asphalt shoulders to the natural level of the open fields on each side.
The accident occurred in the above described curve and involved a 1961 Falcon station wagon which was being driven in a southerly direction by Peggy Ann Garner and a 1964 Ford pick-up truck which was being driven in a northerly direction by Jessie J. McKeithen.
Charlene Garner was sitting in the right front seat of the station wagon and was killed instantly. Peggy Ann Garner failed to retain consciousness and died two hours later.
The severity of the impact is evidenced by the extensive damage to each vehicle which occurred when the right front of one collided with the right front of the other.
The McKeithen vehicle came to rest facing north and astride the center line of the highway with approximately one-third of the vehicle remaining in its lane of travel and two-thirds in the Garner lane of travel. The Garner vehicle crossed the McKeithen vehicle's lane of travel and came to rest facing east on the eastern slope of the roadbed just beyond the outer edge of the asphalt shoulder. Following the accident measurements were taken indicating that the vehicles came to rest approximately eighty feet apart.
Plaintiffs' counsel urges that the accident occurred in one of two ways: (1) that McKeithen had been drinking excessively in the afternoon and evening of the accident and as a result thereof lost or failed to have proper control of his pick-up truck and veered directly and sharply into the Garner lane of travel; or, (2) that because of his drinking and lack of control of his vehicle McKeithen sideswiped another car (Rolen) which was traveling immediately *342 ahead of the Garner vehicle and as a result the McKeithen vehicle suddenly careened or darted into the Garner lane of travel.
Defendants urge that the point of impact was on the eastern asphalt shoulder and across the McKeithen lane of travel and that the accident was the result of an attempt by the driver of the Garner vehicle to pass the Rolen vehicle. Defendants further contend that McKeithen's faculties were not impaired by the alleged excessive drinking on his part; and, in the alternative, if the evidence does support the conclusion that McKeithen had been drinking excessively or that his faculties were impaired, that plaintiffs failed to prove a causal relation between the alleged drinking and the accident.
Because of the damage to the right front of each vehicle, clearly indicating a right front to right front type of collision, the ultimate issue for resolution in this case is whether the accident happened in the Garner (southbound) lane of travel or in the McKeithen (northbound) lane of travel.
Obviously, the jury adopted either one or both of plaintiffs' contentions and rejected those of defendants. For reasons which we will more fully discuss herein, we are convinced that the jury committed manifest error in adopting either one or both of plaintiffs' contentions. In so doing we fully recognize that we are setting aside a jury verdict as to a finding of fact and reversing a judgment of the trial court based thereon. However, we firmly believe that the verdict of the jury is contrary to the law and the evidence to the extent that we are left with no other alternative.
A jury's verdict is entitled to great weight and appellate courts are loathe to upset the findings of a jury except in the clearest and most compelling case of error to prevent a result that the court would deem an ultimate miscarriage of justice. Thrash v. Continental Casualty Co., et al., 6 So.2d 75 (2d La.App., 1941, writ refused, 1942); Matthews v. New Orleans Terminal Co., et al., 45 So.2d 547 (Orl.App., 1950); Crier v. Marquette Casualty Co., 159 So.2d 26 (Orl.App., 1963, writ refused, 1964); Fontana v. State Farm Mutual Automobile Ins. Co., 173 So.2d 284 (3rd La.App., 1965, writ refused, 1965); Malbreaugh v. City of Baton Rouge, et al., 68 So.2d 619 (1st La. App., 1953, writ refused, 1954); Gordon v. Pittman, 61 So.2d 609 (1st La.App., 1952, writ refused, 1953); Lambert v. State Farm Mutual Automobile Ins. Co., 184 So. 2d 107 (4th La.App., 1966); La.Const. Art. 7, § 29.
Before discussing the testimony of the various witnesses we should bear in mind that negligence is never presumed and the burden of proving negligence rests with the party who charges its presence. Thrash v. Continental Casualty Co., et al., supra; Oliver v. Pitarro, 129 So.2d 39 (2nd La. App., 1961); Crier v. Marquette Casualty Co., supra. This negligence must be established with reasonable certainty and by a preponderance of the evidence. The showing of mere possibility or probability of its existence is insufficient. Thrash v. Continental Casualty Co., et al., supra; McGregor v. Saenger-Ehrlich Enterprises, 195 So. 624 (2nd La.App., 1964). Probabilities, surmises, speculations and conjectures cannot be accepted as sufficient grounds to justify a recovery to a plaintiff who is charged with the burden of proof. Williams v. Wolfe, 187 So.2d 763 (1st La.App., 1966); Crier v. Marquette Casualty Co., supra; Lambert v. State Farm Mutual Auto. Ins. Co., 184 So.2d 107 (4th La.App., 1966).
The evidence presented by plaintiffs relative to McKeithen's drinking relates to both of plaintiffs' contentions. The additional evidence relied upon by plaintiffs in support of contention (1) consists solely of the testimony of Mr. William J. Fuller. The additional testimony relied upon by plaintiffs in support of contention (2) consists entirely of testimony elicited from defendants' witnesses while under cross examination with the exception of two items of physical evidence, namely: damage to the *343 left rear fender of McKeithen's vehicle and damage over the left front headlights of the Rolen vehicle, which evidence plaintiffs assert substantiates a sideswiping incident between the Rolen and McKeithen vehicles. We will discuss these points in the order mentioned.
Under cross examination McKeithen testified that he left his home between 5:30 and 6:00 P.M. and went to Ma Crockett's where he remained until 8:00 P.M. when he left to go to a basketball game with Tommie and Joe Beckley. He returned to Crockett's following the basketball game and stayed there until approximately 10:30, when he left to go to LaSparta Cafe. The accident occurred before he reached LaSparta's. He admits leaving Crockett's with an open can of beer in his hand which he was drinking and two unopened cans in a paper bag which he intended to drink on the way home. McKeithen admitted that he was in the habit of drinking beer while driving but denied that he had consumed an amount on this evening to the extent that it would impair his ability to operate his vehicle. McKeithen was thrown from and found lying beside the left door of his vehicle. He stated that he recalls nothing of the accident.
Alfred C. Smith testified that he had known McKeithen for sometime but never had an occasion to go out with him. He stated that on the afternoon of the accident at approximately 5:00 P.M. he was walking home after his car had broken down when McKeithen stopped and started talking to him. He observed that McKeithen had a can of beer in his hand and said "something about being out to Ma Crockett's". The witness's testimony under cross examination was concluded with the following question and answer: (Page 197)
"Q And he drove up and stopped and you just saw him with one can of beer and talked to him a little bit, that's all you know about it?
A That's all."
Jerry Harrison testified that he had known McKeithen ten or twelve years and had occasion to meet and talk with him frequently. This witness stated that he saw McKeithen at Crockett's Bar about 9:00 or 9:30 P.M. o'clock and that McKeithen was "standing next to the service window with a can of beer in his hand" and was talking "to a group of people". The witness's entire testimony on cross examination is as follows: (Pages 203, 204)
"Q You then, is it fair to summarize your testimony in saying that for a time about 9:00 or 9:30 at Crockett's place you saw Jay Boy near the service window with a can of beer in his hands talking to some people?
A Yes, sir.
Q That's all you know?
A Yes, sir.
Q That's all you saw?
A Yes, sir."
Gerald Smith stated that he had known McKeithen for about two years and that he too had seen McKeithen at "Mrs. Crockett's" on the night of the accident and that the witness had "around five or six beers" with McKeithen. He observed McKeithen leave between 10:15 and 10:25. He stated that on occasions when McKeithen had been drinking "well, he is happier, I mean more friendly and is always shaking hands * * *" and that on that evening he saw McKeithen shaking hands in the manner that he usually does when he has had a lot to drink. The witness stated that McKeithen left with a package in one hand and an open beer in the other. The witness concluded his testimony under cross examination with the following questions and answers: (Page 214)
"Q How much had you had to drink? I think you said five or six cans, is that right? Did you have anything else?
A No, I just got there and drank five or six cans of beer.

*344 Q And that is about all you know about it according to your testimony? You were there, you had five or six cans and Jay Boy was drinking, too, is that right?
A Yes, sir."
Clinton Eugene Payne stated that he had lived in Columbia, Louisiana approximately five years during which time he had come to consider himself a personal friend of McKeithen. He stated that on the night of the accident at approximately 6:30 he saw McKeithen at the River Queen where he stayed fifteen or twenty minutes when the two left in McKeithen's truck to go to Ma Crockett's. The witness had one beer and because he had a date he departed. The witness returned to Ma Crockett's about 10:00 and observed McKeithen coming out of the side door and described the events as follows:
"A He came out the door and slammed the screen door back and he hollered one time
Q What kind of hollering are you talking about?
A He hollered ya-hoo or something like that real loud.
Q What else did you observe?
A Well, he had a quart of beer in his right hand and walked out about, I would say, five yards or something like that and he turned it up and drank from it for a spell and turned it down and he hollered again and went over by his truck and used the bathroom.
Q Used the bathroom by his truck?
A Yes, sir.
Q Did you observe his walking at that time?
A Well, when he came out, I mean he staggered. He staggered, you know, back and forth."
The next time the witness saw McKeithern was in the operating room at the Caldwell Hospital. He this occasion the witness stated that McKeithen appeared to him to be in the same condition that he had been on a previous occasion when he considered McKeithen intoxicated and that "he could smell that" McKeithen had been drinking.
In rebuttal to the aforementioned testimony relative to McKeithen's state of sobriety on the afternoon and evening of the accident, defendant recalled as their own witness, Jerry Harrison, who was asked and answered:
"Q Was there any, anything that you saw in his manner that indicated to you in any way that he was drunk at all?
A No, sir."
Patricia Ann Nolan testified that she saw McKeithen around 9:00 or 9:30 P.M. at the River Queen and at this time she observed nothing that would indicate that McKeithen was under the influence of intoxicating liquor.
Dr. Harry W. Winters treated McKeithen at the Caldwell Hospital shortly following the accident and testified that he observed nothing in the actions of young McKeithen that would indicate that he was under the influence of intoxicating liquor. The witness testified that he did not discern any alcoholic odors.
Mr. Judson Tingle testified that he first saw McKeithen at the hospital and that he took McKeithen from the hospital to his home. The witness stated that he did not observe "anything which would indicate" that McKeithen was under the influence of intoxicants.
Mr. Lloyd Harvey was the first person to see McKeithen following the accident. As he approached the scene of the accident, McKeithen was lying face down and to the left of his pick-up truck. Because McKeithen was lying face down in some oil *345 and the witness was fearful that he might strangle, he moved him to a safer place. The witness was asked:
"Q Did you at any time observe anything in the nature of alcoholic (sic) beverages on his breath?
A No, sir, I didn't smell nothing because he had oil all over me and he had oil all over him, too."
Deputy Sheriff Lance Arthurs, a first cousin of Mrs. Mayes, testified that on the evening of the accident he together with Deputy Reitzell and Marshal Grant were on routine patrol and observed McKeithen about twenty minutes before the accident on the southside of Columbia when they were turning around in front of a filling station as McKeithen passed going north. He testified that at this time McKeithen was operating his vehicle in a normal manner. When asked if there was anything about the operation of the vehicle which caused the witness to pay any particular attention to it, he answered. "If there had been, we would have stopped him."
Lastly, we have the deposition of Michael Lutrick. This deposition was taken at the instance of plaintiffs while the witness was in the military service in Florida. However, the deposition was offered on behalf of defendants. Lutrick deposed that on the evening of the accident between 8:30 and 9:00 o'clock he saw McKeithen at Crockett's Bar and while McKeithen had a can of beer in his hand he did not observe him drinking.
In discussing the effect of the above testimony with respect to McKeithen's drinking on the afternoon and evening of the accident, two equally important considerations must be kept in mind. The first is whether or not the testimony preponderates to the effect that McKeithen's ability to drive his vehicle was impaired; and secondly, if impaired was such impairment a contributing cause of the accident.
No set formula can be prescribed to determine whether or not an individual is or is not under the influence of alcoholic beverages to the extent that his ability to drive is impaired. The above quoted testimony relative to McKeithen's drinking is conflicting and does not, in our opinion, resolve the issue. It is admitted that for the greater part of the afternoon and evening McKeithen was seen at one place or the other either with a can of beer in his hand or drinking. One witness definitely testified that in his opinion McKeithen was drunk. Yet, on the other hand other witnesses detected no signs of intoxication. Immediately before the accident police officers observed him driving his truck in a normal manner. Accordingly, we must look to the evidence relative to the actual occurrence of the accident to determine whether or not additional light is thrown upon the question of McKeithen's alleged impairment. We must do so because the theory of plaintiffs' case is that McKeithen's ability was impaired and resulted in his driving his truck into the path of the Garner vehicle as testified to by Fuller or that said impairment caused McKeithen to sideswipe the Rolen vehicle and then careen into the path of the Garner vehicle.
We are firmly convinced for reasons hereinafter stated that if such impairment in fact existed Fuller's testimony and that of the occupants of the Rolen vehicle completely negate the necessary causal relation between such impairment and the accident.
We find the testimony of Mr. Fuller rather difficult to follow and therefore quote at length therefrom.[1](a-p) Mr. Fuller *346 stated that he was driving his International diesel semi truck and trailer southa on Highway 165 at a speed of 58 to 60 miles per hour.d When he was approximately

*347 150 to 200 yardsb north of the scene of the accident a grayish blue vehicle, also traveling in a southerly direction, passed him on a curve. The grayish blue vehicle proceeded *348 on and passed anotherg vehicle which was also proceeding south on Highway 165.e The grayish blue vehicle passed the Garner vehicle in the curve where the wreck occurred.f The witness then saw the headlights of either two or three oncoming vehiclesh approaching him from the south. He then explained the accident as follows:
i"A And then looking across and this gray car pulls away from the tail lights. I am looking at and these others come in and the one ahead, the nearest one to me oncoming, all of a sudden, I see the lights separate like, and this car runs off of the road on the side, the car, the first one to me, and then I see the lights of the other one as they more or less separate, the one coming at me and the one following him, they more or less separate like, and then I see the tail lights of the station wagon across."
As the witness stated, he observed the headlights of the first oncoming vehicle "separate" to the witness's left and the tail lights of the Garner vehicle "separate" to the witness's right.j McKeithen was driving *349 the vehicle referred to by the witness as bearing the second set of headlights. It was the second vehicle that collided with the station wagon.k Immediately following the accident the first vehicle pulled to its right and parked on the eastern edge of the highway.l At this time the witness had approached to within 50 yards of the scene of the accident.m The witness explained that as the above events commenced to occur before him he proceeded to reduce his speedn and brought his vehicle to a halt north of the scene of the accident. By the time he had stopped he observed two or three other cars that had approached the scene of the accident from the south or opposite direction and had stopped.o Mr. Fuller estimated that when the accident occurred the grayish blue vehicle was "approximately half a block" ahead of the Garner vehicle. As will be more fully explained the grayish blue vehicle referred to by the witness was the Rolen automobile. The witness concluded his testimony on direct examination by stating that the Garner station wagon never left its proper lane of travel prior to the collision.

* * * * * *
Mr. Fuller stated on cross examination that as other persons converged on the scene of the accident he asked if he could be of any assistance. When he was told that he could not he then felt that he should move his "rig" from the scene so as to prevent any further congestion. He therefore departed without giving anyone his name or making his identity known and proceeded on to Olla, some fifteen miles further south.
We are convinced that the account of the accident as related by Mr. Fuller is wholly unsupported and in fact successfully contradicted by other more reasonable, cogent and logical evidence which forces us to conclude that plaintiffs have failed to bear the burden of proof as to contention (1).
Mr. Lloyd Harvey who resides in Hebert, Louisiana, about twelve miles east of Columbia, testified that on the night of the accident he had been to Monroe. He was accompanied by his son-in-law, Lyndall Brown, and his daughter and grandchild. Brown was driving, his granddaughter was in the front seat, Harvey and his daughter were in the rear. Just before the accident they were traveling south (the same direction as the Garner, Rolen, and Fuller vehicles). His son-in-law observed that there had been a wreck and that the McKeithen vehicle was facing them and in the position previously described. The son-in-law stopped his car approximately 100 feet north of the McKeithen vehicle. The witness got out and hastened to the scene. When he arrived he observed McKeithen lying face down on the concrete portion of the highway, near the left door of his vehicle with his head near the door and his feet pointing to the edge of the highway. There was oil draining from the truck and the witness thought McKeithen was "breathing some of that oil and stuff off of that road" so he moved him over to the side and eastern edge of the asphalt shoulder.
He stated that as he stepped out of his car, he observed McKeithen move and then said to his son-in-law "This man is still alive. Rush on down and notify the officers". Brown then proceeded to pass to the east of the McKeithen vehicle and continued on south to Columbia for the purpose of securing help. Harvey remained with McKeithen until additional assistance arrived which he stated was five or six minutes later. This testimony considered with the testimony of the other officers who arrived at the scene of the accident can in our opinion leave no doubt as to the fact that Mr. Harvey was the first person to arrive at the scene of the accident and remained there alone until Officers Reitzell, Arthurs and Grant arrived. The officers were notified of the accident by the occupants of the Rolen vehicle who were just ahead of the Garner vehicle when the accident occurred.
Mr. Harvey was emphatic in his testimony that there were no other vehicles at the scene except the two wrecked cars; *350 that he was there alone for five or six minutes before the officers arrived; that he observed no International truck or trailer;[2] that he recognized Officer Grant as the latter came up to him; and that it was Officer Grant who came up to him while he was standing by the side of McKeithen.[3] Not only did Mr. Harvey fail to observe or see Fuller's truck neither did any other witness who arrived at the scene of the accident and testified in this case. Another point is that if there was a car (the first set of headlights) preceding the McKeithen vehicle as testified by Mr. Fuller that car did not remain at the scene of the accident and its identity still remains unknown.
Mr. Harvey's testimony is consistent, straight forward, and remains uncontradicted and unimpeached.
We now turn our attention to plaintiffs' contention (2) which involves the alleged sideswiping incident between the Rolen and McKeithen vehicles. The vehicle frequently referred to in this opinion as "bluish gray" is a four door Chevrolet automobile which was being driven south on U.S. Highway 165 by Eugene Dunn who at the time of the accident was fifteen years of age. Riding with him in the front seat was Russell McClary. In the rear seat were Wanda Dunn and Connie Rolen. Rolen's mother owned the car. These witnesses stated that they were returning from Monroe where they had attended a movie. Just south of Monroe Connie Rolen permitted Eugene Dunn to drive the car.
Eugene Dunn stated that he was proceeding in a southerly direction and was driving between 45 and 50 miles per hour and that he had observed the headlights of the Garner vehicle behind him for about a mile and as they approached the curve where the accident occurred he noticed the oncoming vehicle. He stated that when the truck "got right on me" he was no longer able to see the lights of the Garner vehicle behind him and "knew that something was going to happen". He further explained that things happened so fast that he was not able to either increase or reduce his speed and that he turned "and looked out my left rear glass, and that is when I heard the squealing when they collided". He stated that the collision occurred in the east lane (for northbound traffic) as the Garner vehicle attempted to pass him.
This testimony is fully corroborated by that of Russell McClary. McClary at the time of the accident was fourteen years of age and, as stated above, was riding in the front seat. This young witness stated that he was aware of the fact this his car was being followed by another and that he observed this car to his rear pull out and attempt to pass his own vehicle. At this instant he observed the McKeithen vehicle traveling north in the oncoming lane and just about even with them. The witness stated "The car had pulled out to pass and the truck was right on us, so I knew there wasn't nothing nobody could do, couldn't nobody get out of the way, they was right together, so that's when I grabbed my face and hollered there was going to be a wreck".
Wanda Dunn confirmed that she was in the backseat with Connie Rolen and the first she knew that anything was going to happen was when for brother[4] exclaimed "There's going to be wreck". She turned around immediately, heard the crash, and saw the truck "in the air". She testified that all of this occurred to her immediate left rear.
Connie Rolen stated that he wasn't paying too much attention to the traffic and was *351 unaware that the Garner vehicle was following his car. He stated that he first became aware of an impending collision when Russell McClary hollered "There's going to be an accident". He immediately turned and looked out his rear window and saw the red truck up in the air "going north toward Monroe in the left lane" (which would be the witness's lane of travel). The witness then asked Dunn "Had he been involved in it, was he the cause of it, or had he had anything to do with it", and Dunn answered no. He asked Dunn to stop the car but Dunn said "No, I'm going on down, just going down to try to get some one to help them * * *" So they proceeded on for approximately a mile to Kenney's Station where they signaled to and stopped Deputy Reitzell and told him of the accident. Eugene Dunn got into the car with the officers and accompanied them. Connie Rolen then got under the wheel of his own car and followed the officers.
Counsel for plaintiffs strenuously urge that the testimony of Connie Rolen, together with his aforementioned inquires of Dunn and Rolen's subsequent actions in attempting to have Dunn stop the car, support the conclusion that the Rolen and McKeithen vehicles sideswiped.
We have reviewed very carefully the testimony of the four occupants of the Rolen vehicle and each steadfastly maintained that their vehicle did not come into contact with the McKeithen truck. Counsel for plaintiffs argued to the jury and again in briefs and before us that the testimony of these four young people is replete with inaccuracies, inconsistencies, and the result of prodding on the part of Sheriff Hodges of Caldwell Parish who conducted the investigation of this accident. We do not agree with counsel and find that all of their testimony taken as a whole and viewed in its entirety fully supports the above summary given by us.
If there exists any doubt as to the occurrence of a sideswiping incident such doubt is dissipated by an examination of the physical evidence which counsel for plaintiffs urges substantiates a sideswipe. That physical damage consists of damage to the left rear fender of the pick-up truck and a damaged spot over the left headlights of the Rolen vehicle. He have examined the slides of these vehicles and common sense dictates to us that the two are wholly incompatible and could not have been the result of the contact of the respective parts of these vehicles. We say this because these two vehicles were approaching each other at a speed of 45 to 50 miles per hour and had the McKeithen vehicle contacted the Rolen vehicle the damage to the latter would have been far in excess of the very slight damage evidenced by the photographs of the Rolen vehicle which were placed in the record. Counsel argues that defendants have failed to prove how the left rear fender of the pick-up truck was damaged. This is conceded. However, defendants have shown by irrefutable evidence how the damage occurred to the left front of the Rolen vehicleit was not by McKeithen's truck.
Mrs. Rolen purchased this vehicle from Mr. Alvin Rushing a year to fifteen months prior to the accident. Mr. Rushing stated that the automobile he sold to Mrs. Rolen was involved in an accident on April 12, 1963 when the left front fender and left headlights were damaged. He had liability insurance and accordingly reported the accident to the insurer to protect himself against a liability claim. He did not have collision insurance and therefore saw no point in repairing the damage. His testimony is fully and completely corroborated by his son, Gerald Rushing, who was driving the car when it was involved in an accident on April 12, 1963. The photographs in this record clearly show that the damage was slight and did not affect the operation of the vehicle.
Deputies William Reitzell, Lance Arthurs and Mr. Louis Grant, Marshal of Grayson, Louisiana, were in the patrol car which was flagged down by Eugene Dunn. These officers immediately proceeded on to the *352 scene of the accident which was just about one mile distance.
Deputy Reitzell stated that as he arrived the vehicles were situated as previously described. He observed McKeithen "lying over on the shoulder of the road". He then radioed for the coroner and an ambulance and returned to the Garner vehicle where he ascertained that Peggy Ann Garner was still alive. He remained with her until the ambulance arrived. When the ambulance left he went to get a camera and returned to take photographs of the vehicles and the scene of the accident.
The witness followed the usual procedure in clearing the vehicles and debris. The next morning he was present with Sheriff Lloyd Hodges of Caldwell Parish and statements were taken from the occupants of the Rolen vehicle.
Deputy Lance Arthurs stated that when he arrived at the scene of the accident with Reitzell and Grant he observed a red pickup truck with a man lying on the left side of it. To the witness's immediate right he saw a Ford station wagon in the ditch. When he got out of his car he observed that Mr. Harvey[5] was with the man lying next to the pick-up truck. When he again looked to his right he observed that the station wagon "seemed like to me it was on fire, smoke from the radiator, * * *" so the witness immediately went to the station wagon. He then recognized that the two young girls were the daughters of his first cousin, Mrs. Mayes. Deputy Arthurs remained at the scene of the accident until the ambulance had removed Peggy Ann Garner. Charlene Garner was removed, and the vehicles were towed away by the two wreckers. He estimated that all this took some two hours. He then spent the rest of the night at the home of Mrs. Mayes. The next morning he transported some of the coroner's jury to the scene of the accident but did not participate in the investigation. He stated that Mr. Grant occupied most of his time by directing traffic at the north end of the wreckage.
Mr. Louis Grant did not testify in the case.
Trooper Otis Dale Powell on being summoned by radio arrived very shortly and commenced his investigation. His statement relative to the position of the vehicles, etc. is the same as that of the other witnesses. The measurements hereinabove referred to were made by Trooper Powell. After the wreckage and debris had been cleared from the scene Trooper Powell went to the McKeithen home, asked to see and was shown McKeithen's driver's license. When he asked to talk to McKeithen he was advised that the latter was asleep. He looked in on him, saw that he was asleep, and did not question McKeithen that evening. While he was at the McKeithen home, John J. McKeithen, young McKeithen's father, called from New Orleans and directed Trooper Powell to turn the investigation of this accident over to Sheriff Lloyd Hodges. In pursuance to this directive from Mr. McKeithen, the Governor of the State of Louisiana, Trooper Powell contracted Sheriff Hodges.
Governor McKeithen testified the investigation would be less subject to question if conducted by someone not under his direct authority.
The Sheriff commenced his investigation the morning following the accident. It was during the course of this investigation that statements were taken from the four occupants of the Rolen vehicle, the only known "eye witnesses" to the accident.
Counsel for the plaintiffs argues very strenuously that the actions on the part of the Governor to remove Trooper Powell *353 as the investigating authority and place the same in the hands of Sheriff Hodges were for the purpose of obtaining an investigation favorable to his son. Frankly, a large portion of this entire record has to do with political implications, accusations by counsel for plaintiffs of favoritism, bias and prejudice on the part of witnesses for defendant because young McKeithen is the Governor's son. It will serve no useful purpose to detail or attempt to summarize the page after page of testimony relative to these accusations. We do, after careful examination of this record, come to the firm conclusion that such accusations and innuendoes were not proven to the extent that the testimony offered by the witnesses accused thereof is biased, prejudicial, or even false as urged by counsel for plaintiffs. For instance, much to do was made over the fact that Trooper Powell was replaced in the investigative process by Sheriff Hodges and yet there is not one scintilla of evidence that Trooper Powell disagreed with any of the factual information obtained by the Sheriff as a result of the latter's conduct of the investigation. The same is true of the other persons in positions of authority who testified in this case. We feel constrained to make these observations because these charges permeate the entire record. To say the least, if we were inclined to hold in this case that we could not as a matter of law state that the jury committed manifest error in its verdict, we would be compelled to grant defendants a new trial on the grounds of the aforementioned prejudicial conduct.
For the above reasons we also find that the jury committed manifest error in adopting the plaintiffs' contention (2).
Accordingly, for reasons hereinabove stated the judgment of the district court is both of these actions is reversed and set aside and judgment is rendered herein in favor of defendants and against the plaintiffs dismissing each of plaintiffs' suits at their costs.
Reversed and rendered.
NOTES
[1] By Mr. Simon:

* * * * * *
(a) Q Now, as you were traveling southerly along Highway 165, I ask you whether or not you say any vehicle which you later related somehow involved, not involved necessarily but at least pleated to this accident?
A I did.
Q And what type vehicle did you see?
A It was a grayish blue vehicle with awell, there was something wrong with the license. I just particularly got in the habit of noticing license tags on the road and there was something later on at a later date that there was something about this particular car, about the license.
Q Something about the license but you don't recall precisely what it was but a defective one or something along those particular lines, it that what you say?
A Yes.
(b) Q Now, approximately where were you on this highway in relationship to where this accident occurred when you noticed this particular vehicle?
A. I was 150 or 200 yards up the road.
Q Now, what vehiclewhat did you notice about this vehicle? In what direction was this grayish blue vehicle traveling at the time?
(c) A It passed me in a curve. Just on the outside of a curve as I came around the curve and was getting out of it, he came around me.
Q And he passed you so he was going the same direction as you were?
A Yes, sir, he was.
Q And at the time that this grayish blue vehicle passed you, about how fast were you then traveling approximately?
(d) A Oh, fifty-eight or sixty.
Q Now, did you observe this vehicle any further after he passed you?
A Yes, sir, I did.
Q And what did you observe about that vehicle and tell us whether or not you observed any other vehicle?
(e) A I see these two tail lights. These tail lights are ahead of me and this vehicle passed me at a high rate of speed and knowing the road, I know there is a curve down there, and with the judgment and everything he is starting to come up on this car about the next curve and I am a watching and he passes the car.
Q This grayish blue vehicle passes you?
A Passes the tail lights.
Q He is proceeding and leaving a distance between you?
A Yes.
Q You say you see the tail lights of another vehicle ahead of this one that just passed you?
A That's right.
Q And it is your judgment that the car that just passed you will appear to overtake the other car ahead of it at about the curve up ahead?
A That's true.
Q Now, did you see whether or not this vehicle that passed you in fact overtook the other vehicle?
A Beg your pardon?
Q Did you seethe vehicle that passed you, did you see if it overtook the other vehicle that was already ahead of you?
A Yes, I did.
Q Now, this first vehicle that was ahead of you before you were passed by that vehicle, had that vehicle ever passed you before?
A No.
Q Just this second vehicle?
A Just the second.
Q Did that grayish blue automobile pass the one in front?
A Yes, it did.
Q Now, the curve you mentioned, what curve are you talking about?
A The curve
Q That you mentioned that the first car that passed you was likely to overtake the other car ahead of you?
(f) A He passed right in the curve where the wreck occurred.
Q Well, this other car, this grayish blue car passed another car before they got to the curve where the accident happened, is that it?
A Yes.
Q Now, after that occurred, did you see any other vehicles?
A The grayish blue vehicle as he passedI could look across the curve and I knew he got around. I could look across the curve and see him, which it would be straight-away and I could see the tail lights of the other vehicle, yes.
(g) Q Then in other words, the other vehicle, the grayish blue vehicle that had passed you, you next saw it after it passed the car ahead of you and it was then, it had negotiated that curve already up ahead where the accident happened?
A Yes.
Q Is that right, it was in the process?
A Yes.
(h) Q Now, did you see any other vehicle coming in the opposite direction while you were watching what you have just described?
A Yes, I did.
Q What type, I mean what vehicles did you see? How many, if you recall? Describe how you saw it.
A Well, in looking at these lights and the tail lights, and let me explain to you, and knowing that these oncoming cars is coming, see, well, it is either two or three, I do not know.
Q Oncoming cars?
A Oncoming cars, two or three, and this car going around and well, naturally, you are looking, you know, and thinking that what might could happen, I mean knowing that the curve is there.
Q Yes.
(i) A And then looking across and this gray car pulls away from the tail lights. I am looking at and these others come in and the one ahead, the nearest one to me oncoming, all of a sudden, I see the lights separate like, and this car runs off of the road on the side, the car, the first one to me, and then I see the lights of the other one as they more or less separate, the one coming at me and the one following him, they more or less separate like, and then I see the tail lights of the station wagon across.
Q In what directionyou say the headlights of the second car appeared to separate from the headlights of the first car toward you, is that right?
A It would, yes.
Q Now, in what direction did the headlights of the second car go in just before you saw the tail lights of the first car ahead of you?
(j) A Well, in looking at it, naturally, looking at it straight like I was looking at it, which the car ahead of him, when he went to his right, that car would separate to my left, which the tail lights on the right would separate to my right.
(k) Q Now, that car, that second car with the headlights you stated became involved in anything?
A Yes.
Q In what?
A It was the station wagon.
Q It was the station wagon.
A Yes, sir.
Q Now, did you see after it hit the station wagon, did you see what happened to the station wagon?
A The station wagon just stopped right off the shoulder of the road and the bumper there, and the pick-up was in the road.
Q Now, this station wagon was the vehicle whose tail lights you saw and which had been passed by the grayish blue
MR. SPAHT: If Your Honor Please, I want to caution against leading questions. We haven't objected to this point but I want, do want to object now. This is a leading question in which he is directing the witness.
MR. SIMON: It is a summary of his testimony.
THE COURT: He is summarizing
MR. SPAHT: I understand. He is in effect testifying and I think
THE COURT: Let's resolve it this way, let him tell how it happened.
MR. SIMON: All right, sir. I am trying to reconstruct it if I can.
(I) Q Now, Mr. Fuller, after the car whose headlights you saw collide with this station wagon, what happened to the car that was ahead, the first headlights, what happened to that car?
A He pulled off and parked.
Q On what side of the road?
A On the right-hand side.
Q On whose right-hand side?
A It would be to my left, it would be to his right. If he was heading north, it would be on his right.
Q Let's try to use east and west and north and south. This way we will get it straight.
A Okay.
Q Assuming that the roadway goes north and south of this particular area what side of the highway, the east side or west side did this first car pull off to?
A It was the east side.
(m) Q Pulled off to the east side. Now, at that time approximately how far were you from the scene of this collision?
A It was approximately, I would say, fifty yards.
Q All right. Now, when you saw this collision, what did you do?
(n) A Well, before the collision I started stopping or slowing back, you know, I backed out because I know the curve and I see the lights, the oncoming, and I know what might could happen so, naturally, I back out and then after I seen what did happen, then I go to stopping, because there is other lights coming and I don't go down and get involved in it.
Q How was your speed in comparison with the speed of the car that was immediately ahead of you before this accident happened? Was the distance
A Maybe fifteen miles an hour difference. I was gaining.
Q You were gaining on this first car. Now, you started slowing down, tell us whether or not you brought your car, your truck to a stop?
A Yes, at that time I did, yes.
Q Now, did you see this vehicle whose headlights you saw veer in the highway, the second headlights vehicle, did you see it after this accident was completed?
A Yes, sir.
Q Where was it? Where was it when you saw it after this accident had occurred?
A It was sitting in the curve of the road, I would say about eighteen or approximately eighteen inches, the left side of it headed north would be setting eighteen, fifteen or eighteen inches west of the yellow line, which would be over in the across the center of the pavement.
Q Now, where was the station wagon or the other vehicle that was involved in this accident when you saw it?
A It was headed east, if we are going to use that, directly east, just off the shoulder of the road. The bumper was hanging up on the shoulder of the road, just off the shoulder of the road.
Q Now, Mr. Fuller, did you see if there was any one around the scene of the accident shortly after it occurred by the time you brought your vehicle to a stop?
(o) A I did. When I stopped first, then I put it in gear and eased on down, and there was people in the car in the front, and then the one in the rear, there had been one or two vehicles by the time I eased down there, there had been one or two vehicles coming from the south headed north that had stopped.
(p) Q Mr. Fuller, just before this accident occurred, can you estimate approximately how far or what was the distance between this station wagon, this vehicle whose tail lights you saw and the bluish gray vehicle? What was the distance between them at approximately that time?
A Oh, approximately half a block.
[2] This is significant because according to Mr. Fuller's own testimony he would have had to have been in front of and immediately preceding Mr. Harvey for Fuller to have observed the accident as Fuller testified.
[3] Deputy Arthurs' testimony corroborates this point.
[4] She later concluded that it was Russell McClary who made the statement.
[5] The record contains the name of "Lloyd Hodges" which is an obvious mistake because the witness confirmed that he had known Mr. Harvey for many years. In the remainder of his testimony he properly refers to Mr. Harvey.