SARTAIN, Judge.
This litigation arises out of an altercation between plaintiff, Herbert R. Storey, and one Doug Skinner. Made co-defendants in the trial court were Mrs. Mickey Stone Skinner and her insurer, State Farm Mutual Fire Insurance Company, on the grounds that Mrs. Skinner aided and abetted Doug Skinner in the alleged attack on plaintiff Storey. [1]
Following trial by jury, plaintiff was awarded $5,000.00, the jury finding that Doug Skinner, intentionally and unprovoked, attacked Storey and that. Skinner was aided by Mrs. Skinner in the commission of the battery, but that the injuries suffered by plaintiff in the attack were neither expected nor intended from Mrs. Skinner’s standpoint. Accordingly, the trial judge rendered judgment against Doug Skinner, Mickey Stone Skinner and her insurer, State Farm Mutual Fire Insurance Company, in the amount of $5,000.-00, said judgment being in solido as it related to Doug Skinner and Mickey Stone Skinner, and as it related to Mickey Stone Skinner and her insurer, but not as it related to Doug Skinner and the insurer of Mrs. Skinner.
Defendants Mickey Stone Skinner and State Farm Mutual Fire Insurance Company now bring this appeal alleging error in the jury’s finding that Mrs. Skinn'er aided and abetted Doug Skinner in any way in the commission of the act. Further error is urged by defendant, State Farm, in the conclusion that its policy provided coverage under the particular facts of this case. Plaintiff has answered the appeal seeking an increase in damages. Defendant, Doug Skinner, has not appealed the judgment against himself.
We reverse the judgment of the trial court insofar as it relates to appellant herein holding Mickey Stone Skinner liable with Doug Skinner and her insurer liable insofar as she was liable.
The testimony presented at trial on this matter reveals that plaintiff was employed by one Steve Perry, a private investigator, to aid and assist in surveillance upon the home of Mrs. Earl Gros (now Mickey *689 Stone Skinner) pending separation and divorce proceedings between she and her former husband. According to testimony by Mr. Perry and plaintiff, this surveillance was conducted at night or early evening on three different occasions sometime between August and October of 1972. During this time Mrs. Gros was observed in frequent company with Doug Skinner. Further, it seems that Mrs. Gros was working for Mr. Skinner, himself a private investigator, typing reports as she 'had done prior to her separation from her husband.
Plaintiff testified that on January 15, 1973, while walking his dog in a vacant field across from Mrs. Gros’ home and in which he frequently exercised his dog (plaintiff lived some three to five blocks from the Gros home), Doug Skinner drove up in his car, alone, exited his car with pistol in 'hand, and after a few words with plaintiff, struck him, first with the empty hand, and then once with the hand holding the pistol, breaking plaintiff’s jaw in the process. He testified further that the only contact he had had personally with Doug Skinner prior to that time was once when he was walking his dog and Mr. Skinner drove by 'him and questioned him as to whether his dog had bitten anyone, and another occasion some five days prior to the attack by Skinner when plaintiff appeared at the Family Court of East Baton Rouge to testify in Gros’ proceedings. At that time he was sequestered along with Mrs. Gros and Mr. Skinner. He was not called to testify on that date as the trial had to be continued and 'had not testified prior to the January 15th incident.
Mr. Taylor Brooks, part-time attendant at a gas station near the residency of both Mr. and Mrs. Gros, was called to testify on behalf of plaintiff and stated that on one occasion (he could not remember when) Mr. Skinner and Mrs. Gros drove up to him at the station and inquired of the plaintiff whether or not Mr. Brooks had seen a man go up the street with a red dog. He answered affirmatively and the pair left with Mr. Skinner driving. Mr. Brooks stated that no threats were made against plaintiff nor were any other statements made about him.
Mickey Stone Skinner (the former Mrs. Earl Gros) testified that she had been Doug Skinner’s secretary and had continued in that occupation after she and her husband separated. She stated that she had a desk, typewriter and stationery at home and did her work there. According to 'her testimony it was a standing joke between her and Doug Skinner that the plaintiff had them under surveillance and they knew of it.
Mrs. Skinner stated that on the day t'he incident occurred she was passing by a large window in her home and noticed plaintiff in the vacant field across from her home. She then stated on direct ex-mination:
“ . . . And I said, hey, there he is again, and I laughed. I said it every afternoon because he was always out there every afternoon. So, I went on in and we started working. And in a minute, Doug, he hadn’t said anything. He got up and he said, I think I’ll go over there and ask him to come over and sit in the yard so he can see better. And he went outside and got in the car and—
Q. Did you go with him ?
A. No, I stayed there.
Q. He had to drive over there?
A. Yes, he drove around the field. You have to go around the block to get there and he laughed—
Q. How far is that?
A. It’s one block straight across that field.
Q. How far would you say that is; can you give an estimate?
*690 A. About 250 yards, I’m not really sure, but that’s all that it is, one block.”
******
“ Q- What was the primary purpose of him leaving and going over there ?
A. I suppose to let Storey know that 'his cover had been blow, because we’d known it for a long time. We might as well let him know, and stop wasting his time.
Q. Did Mr. Skinner mention anything to you about going over there and getting in a fight with this man?
A. No indeed.
Q. After he left, got in the car and left the house, what did you do?
A. I went on out in the front yard to to see what was going to happen.
Q. And what did happen?
A. Well, Doug pulled his car up and he stopped and he got out and he started walking toward Storey and Storey started walking toward him. And they got together. They stood there and they talked a minute. And then Storey swung at Doug. And they grabbed each, other and fell down and that’s all I could see. I couldn’t see any more from where I was. Once they hit the ground I couldn’t see them at all.”
******
“Q. Mrs. Skinner, did you in any way entice or aid or contribute in any way to Mr. Skinner going over there that day?
A. No, I sure didn’t.”
Testifying to Mrs. Skinner’s role in the incident Doug Skinner, on direct examination, stated:
Q. What was your reason and motive for going over there to talk to him ? A. Well, like Mrs. Skinner said awhile ago, it was to blow his cover, to tell him that we knew exactly what all he was doing. We’d been knowing it for months. And jokingly to ask him to come over in the front yard where he could get a real good view and, you know, where he wouldn’t have all that problem.
******
“Q. Mr. Skinner, when you went over into the field and when you left Mrs. Skinner’s house, did you have any intention of getting in a fight?
A. That was the farthest thing from my mind was getting in a fight. Like I said, we was fixing to go to Court. That would have been the worse thing possible.
Q. Did Mickey Gros ever ask you or encourage you to do any violence toward Mr. Storey.
A. No, she did not. We’d known he was out there for four months, and never was one word said.
Q. She never suggested that you remonstrate with him or beat him up in any way?
A. No.
Q. What did you tell her you were going to do?
A. I just said I’ll be back in a minute. I started out the door and she says, what are you going to do. And I said, well, I’m going to go over there and tell him that his cover is blowed and ask him to copie over in the yard where he could see our activities real well instead of way over in the field.
Q. Did she ask to go with you?
A. No, she didn’t. She didn’t say anything. She stayed. When I *691 walked out she kitchen table. was still at the
Q. Did she ask you to do anything?
A. She didn’t ask me to do not one thing.”

“Q. Did you and Mickey ever discuss doing any harm or violence to Mr. Storey ?
A. No, we never discussed anything like that because it wasn’t that important for any kind of violence or anything like that. It was a big joke that he was over there every day and wasn’t accomplishing anything, couldn’t have accomplished anything.
Q. But, you did know that he had you under surveillance ?
A. Yes. ...”
On cross examination Mr. Skinner stated:
“Q. Now, you stated that Mrs. Gros had no part in urging you to get involved with Smokey; is that right ?
A. That’s right.
'Q. On this particular day we are talking about, January 15th, 1973; is that right ?
A. That’s right.
Q. She never urged you to have anything to do with him ?
A. She never urged me to have any kind of violence or anything since I’ve known her.
Q. And yet the two of you got in the car. She was with you that day you went to that filling station asking about him, asking what his name was and something about him.
A. That was four months before when we first got the papers and knew that we were being watched. At that time we did know him; therefore, we was interested in who he was and what he looked like.
Q. You found out at that time?
A. Yes, four months prior to that.
Q. Knew his name.
A. I think we found out his name was Smokey. And shortly after that I found out his name was Herb Storey. He worked for Ron Johnston.
Q. And that was before the incident of January the 15th, 1973?
A. Yes, that was back in October of ’72.”
Mr. Skinner, again on direct examination, testified:
“Q. Mrs. Skinner, this is your third time and I hope the last on the witness stand. On the day of the fight did you tell Doug or suggest to him that he go over and talk to Storey ?
A. No.
Q. Whose idea was it that he go over and talk to him?
A. It was Doug’s.
Q. Did he ask for your permission or approval to go talk to him?
A. No.
Q. Did you ask him to do anything in regards to Storey?
A. No, sir. I didn’t.
Q. Referring not only to the day of the fight, but prior to that, did you ever ask him to take any action toward Storey of any kind?
A. No.
*692 Q. When he left your house, did he say anything about going over to beat him up or anything like that?
A. No, he sure didn’t.
Q. What did he say?
A. He said that he was going to go over and ask him to come in the front yard so he could see better, get a better look.
Q. And I believe you said in prior testimony that it was something of a joke about him being over there, between you?
A. Yes, it was. We laughed about him every day, almost.
Q. And is that the spirit you took it in—
A. Yes, I did.
Q. —when he said he was going to ask him to come get a better look?
A. I thought it was all a big joke. He thought it was all a big joke.
Q. Well, you knew that you had been under surveillance for some time then?
A. Yes.”
* * * * * *
“Q. Now, have you ever without regard to any particular date counseled or advocated any violent action toward Herbert Storey ?
A. No.
Q. Have you ever encouraged anyone to do anything to him ?
A. No.
Q. When you saw there was a fight were you surprised ?
A. I was very surprised.”
The plaintiff’s own testimony with respect to Mrs. Skinner’s involvement in this matter as stated by him appears in the record as follows:
“Q. Now, on the day of the fight, did you see Mickey Gros at all?
A. No.
Q. She was not present at the place where the fight took place?
A. No.
Q. And did you see her or hear anything from her on the day of the fight ?
A. No.
Q. And when was the last time you saw her prior to the fight?
A. In Court.
Q. Prior to the fight, had you ever had any conversation with her ?
A. Not to my knowledge.
Q. She never said anything to you and you never said anything to her ?
A. No.
Q. And then of your own knowledge, you can’t say what her activities were at all on the day of the fight ?
A. No.
Q. But, you do know that she was not present when the incident occurred.
A. She wasn’t with Mr. Skinner in the car when he got out of the car, no.
Q. And you didn’t see her with him on any other place on the day of the fight; did you ?
A. No.”
This was the extent of the testimony offered at trial concerning Mickey Stone Skinner’s involvement in the matter. It is from this evidence that the jury concluded that Mrs. Skinner aided and abetted Doug Skinner in his actions but did not intend the resulting injuries.
*693 The mandate of the Louisiana Constitution is now and has been clear that the appellate courts of this state are to review both the law and the facts in civil cases, whether the trial be one before judge or jury. La.Const. of 1974, Art. 5, § 10, La. Const. of 1921, Art. 7, § 29. It is also clear that the findings of fact by the trial judge or jury shall not be disturbed absent a positive showing that such findings are manifestly erroneous upon the face of the record.
We cannot help but conclude in the present case that it was manifestly erroneous for the jury to find that Mrs. Skinner aided and abetted in Mr. Skinner’s actions. The record before us is, in our opinion, completely devoid of any evidence upon which such a finding could be based. This is not a case where the appellate court is asked to overturn a jury’s finding that one witness was more or less credible than another witness. In the present case, no witness was offered nor evidence tendered which in any way could be held to legally implicate Mrs. Skinner in this matter, and any findings of implication based on the evidence here presented are, in our opinion, manifestly erroneous. See Lambert v. State Farm Mutual Automobile Insurance Co., 184 So.2d 107 (La.App. 4th Cir. 1966); Luria Brothers & Co. v. Capitol Steel, Inc., 225 So.2d 630 (La.App. 1st Cir. 1969). In Mayes v. McKeithen, 213 So.2d 340 (La. App. 1st Cir. 1968) [1] in reversing a jury’s verdict we stated that a plaintiff’s cause of action “ . . . must be established with reasonable certainty and by a preponderance of the evidence. The showing of mere possibility or probability of its existence is insufficient. Thrash v. Continental Casualty Co., et al., supra, La.App., 6 So.2d 75; McGregor v. Saenger-Ehrlich Enterprises, 195 So. 624 (2nd La.App., 1964). Probabilities, surmises, speculations and conjectures cannot be accepted as sufficient grounds to justify a recovery to a plaintiff who is charged with the burden of proof. Williams v. Wolfe, 187 So.2d 763 (1st La.App., 1966); Crier v. Marquette Casualty Co., supra, La.App., 159 So.2d 26; Lambert v. State Farm Mutual Auto. Ins. Co., 184 So. 2d 107 (4th La.App., 1966).”
Since we have concluded that liability on the part of defendant, Mickey Stone Skinner, has not been shown, we need not direct ourselves to the serious question raised by defendant, State Farm, under the exclusionary provisions of its policy with respect to the apparent inconsistency in the jury’s finding that Mrs. Skinner aided and abetted Doug Skinner in the commission of a battery, itself an intentional tort, but did not intend the direct consequences of that action.
With respect to plaintiff’s demand for an increase in damages, we find no abuse of the jury’s discretion. The evidence produced at trial with respect to plaintiff’s injuries include hospital records which indicate that plaintiff had a compound comminuted fracture of the right body of the mandible which was corrected by an open reduction on January 23, 1973. It appears from these records in a postoperative report dated June 6, 1973, that x-rays showed “good healing”. The records further indicate that medical expenses incurred amounted to $737.55. No other medical testimony was offered in support of plaintiff’s claim. Considering the evidence produced we cannot say the jury abused its discretion in its award of $5,000.00.
For the above and foregoing reasons, the judgment of the trial court insofar as it relates to defendants, Mickey Stone Skinner and her insurer, State Farm Mutual Fire Insurance Co., is reversed and the same is hereby entered in favor of these defendants dismissing plaintiff’s claim against them. The judgment of the trial court insofar as it relates to the quantum of $5,000.00 awarded to plaintiff is affirmed. All costs of these proceedings in *694 the trial court are to be borne by defendant, Doug Skinner. All costs incidental to this appeal are to be borne by plaintiff-appellee.
Reversed in part, affirmed in part and rendered.

. Writs refused, 252 La. 965, 215 So.2d 130 (1968).