ROGERS, Judge.
Plaintiff, Larry Phil Harris, filed suit against defendant, Darbes J. Landry, Jr., to enjoin him from making certain use of lots in Lynwood Subdivision, in violation of restrictive covenants affecting the subdivision. The district judge granted a preliminary injunction against defendant and he has appealed.
The trial judge has deciphered the testimony well and we adopt substantially his reasons for judgment in this opinion.
“Lynwood Subdivision, where the restrictive covenants apply, is a small subdivision lying on the north side of the ‘Old Spanish Trail,’ a parish road running east and west between Sulphur and Westlake. The subdivision is rectangular in shape and has but one dedicated street in it, Lynwood Avenue, which runs north and south and forms a T-intersection with the Old Spanish Trail. On the north and south ends of the subdivision there are some alphabetically designated lots which are not covered by the restrictions. In between these alphabetically designated lots there are 28 numerically designated lots, 14 on each side of Lynwood Avenue, the 14 on the west side forming Block 1, and the 14 on the east side forming Block 2. The plaintiff in this injunction suit owns Lots 8 and 9 of Block 1; his dwelling is located on Lot 8 and is on the west side of Lynwood Avenue. Landry, the defendant, owns Lots 8 through 12 of Block 2, across the street. The numbering of these lots is from south to north, so that Harris’ ownership lies about midway of the subdivision, and Landry’s ownership begins about midway and goes nearly to the north end of the subdivision.
Landry has never used and is not now using any of the five lots for residential purposes. He has recently cleared all five lots with the confessed intent of utilizing them for commercial purposes, to expand his commercial business which lies adjacent to the subdivision.
It is not necessary to examine in detail the actual language of the restrictive covenants applicable to Lynwood Subdivision. It satisfies our purposes merely to say that the restrictions, which were established in 1957 and are still in effect, specifically limit the use of the lots as ‘residential lots’ that shall be used for ‘residential purposes only’ and prohibit the establishment thereon of any ‘noxious or offensive trade, pursuit or activity’ or anything ‘which may become any annoyance or nuisance to the neighborhood or adjacent owners.’ It is not necessary to examine these restrictions in greater detail because whether or not they are being violated is not an issue in this case. The defendant frankly and honestly admits the violation and in fact bases his entire defense on prescription. The defendant rests his entire case upon the contention that the lots, having been used for commercial purposes in violation of the restrictions for a period in excess of two years, are freed from the restrictions by virtue of liberative prescription.
° A little over 100 yards east of the intersection of Lynwood Avenue and the Old Spanish Trail, there is a public street called Landry Lane that goes north from the Old Spanish Trail. On the left side of this street and facing it, Landry owns a tract of land next to property of his father and other members of his family. This tract lies outside Lynwood Subdivision but is adjacent to the subdivision. Landry’s property on Landry Lane is contiguous to a portion of the rear boundary of Lot 13, all of the rear boundary of Lot 12, and a portion of the rear boundary of Lot 11, all in Block 2 of Lynwood Subdivision. This tract, which we will refer to as the Landry Lane property, was purchased by defendant in 1965. It measures 165' by 150'. .
Landry has his personal residence on the Landry Lane property, and also, since 1968, he has operated a sole proprietorship there known as ‘Brimstone Fabrication and Welding Company.’ This business will hereinafter be referred to as ‘Brimstone.’ The original Brimstone shop was built next to his house.
*244 As its name indicates, Brimstone is a business that involves welding and metal fabrication. In 1972 and 1973, it was still pretty much a one-man operation. Landry first built a small shop next door to his house in 1968. ■ Living next door to his shop, he often went there and worked at night. His business grew. It enjoyed steady growth. From no more than two employees, two or three years ago, it now employs 26. From a small shop 20 feet long in 1968, the shop area has been increased presently to 80 feet in length.
Thfe raw materials for metal fabrication involve pipe and metal of various shapes and dimensions. With both a residence and a fabrication shop crowded together on a lot measuring 165' by 150', it is not hard to see that any business growth would require additional space. As Brimstone grew, and developed, handling a greater volume of business and employing more persons, its need for additional space grew commensurately. The additional space was needed not only for the storage of the metal pipe, plate, angles, etc., that are needed in such a business, but also more space was needed to actually do the work, because not all the fabrication work was done in the shop itself. There were times when painting and sandblasting was done outside the shop. Also, as the business expanded there arose a need for another access route for the shop in addition to access from Landry Lane.
Anticipating these needs, approximately two years ago Landry negotiated with the owner of Lot 13 of Block 2 of Lynwood Subdivision for a right-of-way for a road from Lynwood Avenue to the back of his shop. Landry actually constructed a rough earthen driveway across Lot 13 and used it a few weeks before negotiations broke down and he was forced to discontinue the use of Lot 13. He then looked about for other access and discussed with its owner, J. C. Carlin, the purchase of Lot 12, which lay immediately south of Lot 13 and also immediately west of the shop. This discussion took place sometime during the latter part of 1973 or early 1974. Carlin also owned Lots 10, 11, 9 and 8 in the block. An oral agreement to purchase all five lots was then reached, culminating in an actual transfer of ownership in late May of 1974. Prior to that time, with the approval of the owner, J. C. Carlin, defendant made some limited use of Lot 12. .
By September of 1974 there was a sufficient use of a driveway from Lynwood Avenue east across Lot 12 to defendant’s shop that labor union pickets, involved in some labor dispute with Landry at that time, were manning the entrance to his business on Lynwood Avenue.
In late 1975, defendant acquired a large contract which demanded immediate additional space. He moved bulldozers onto the five lots in Block 2 of Lynwood Subdivision and commenced clearing them. In early 1976, he caused oil to be poured on the ground and some 70 yards of shell deposited there. Heavy equipment began moving about on the lots. A build up of storage of metal raw materials also began to manifest itself on these lots.
It was this upsurge of commercial activity, occurring in latter 1975 and early 1976, that caused the plaintiff herein to file his suit seeking an injunction. The suit was filed on February 27, 1976.
The sole defense[1] herein is based upon LSA-R.S. 9:5622(A), which reads as follows:
‘§ 5622. Restrictions in title to land ‘A. Actions to enjoin or to obtain damages for the commission or continuance of a violation of restrictions contained in the title to land are prescribed by two years, reckoning from the commission of the violation. When this prescription shall have accrued, the particular parcel of land shall be forever free from the restriction which has been violated.’
Relying upon Chexnayder v. Rogers, 95 So.2d 381 (La.App. 4 Cir. 1957), and Le- *245 Blanc v. Bowen, 238 So.2d 369 (La.App. 4 Cir. 1970), defendant urges that the storage of pipe and raw materials on a portion of one lot (Lot 12) commenced a commercial use of all five lots and that since more than two years have elapsed since the inception of the commercial operation and February 27,1976, the date suit was filed, all five lots are free from the restriction against any type of commercial operation. Defendant urges that we apply the well-established rule of construction that stipulations contained in restrictive covenants are stricti juris and every doubt should be resolved in favor of the unencumbered use of the property.
The party who pleads prescription has the burden of proving it. Accordingly the defendant is required to prove that the liberative prescription of LSA-R.S. 9:5622(A) has accrued and that this present use of the property for commercial purposes is protected because the property is free of any restriction against commercial use.
In other words, the defendant is required to prove that the commercial use of these lots began no later than February 27, 1974, and has continued uninterruptedly since that time.
* * * * * *
The violation of a restriction for two years frees ‘only the particular parcel of land’ according to R.S. 9:5622(A). In this sense, with reference to the division of an estate ‘parcel’ can only mean the same as ‘lot.’ Where an owner owns several lots, each lot must be considered independently. Sherrouse Realty Company v. Marine, 46 So.2d 158 (La.App. 2 Cir. 1950). Considering each lot independently and with particular respect to Lots 8, 9 and 10 of Block 2, there is no evidence at all of any commercial activity on these lots until in recent months. Therefore, there is no question that they are still burdened with restrictions and all commercial activities thereon must be enjoined.
The most disputed issue of fact in this case, is what was taking place on Lots 11 and 12 on February 27, 1974. For it was on this date, two years before the filing of the present suit, that the two year libera-tive prescriptive period had to begin, that the establishment of a commercial business sufficient to amount to a violation of the restrictions had to commence, in order that its continuance for two years can now be said to have freed these two lots from the restriction that forbids their use for commercial purposes. There was only scant evidence to show a partial use of Lot 11 more than two years before suit was filed. A closer fact question exists as to Lot 12; the court concludes that defendant .has failed to prove a substantial use thereof on or before February 27, 1974. At best, the testimony for defendant establishes only that there was storage use of a small area at the back of Lot 12 during the latter part of 1973 or early 1974, and that a road of sorts was established across that lot at some time during the same general time period. Based on the testimony of defendant’s witnesses, alone, it is just as probable that these activities commenced after February 27,1974, as before. When all the testimony is considered, it is clear that defendant has failed to bear his burden of proof by a preponderance that a violation has occurred for two years.
J. C. Carlin, considered by defendant himself to be one of his key witnesses, and highly regarded by the court, gave testimony which the court considered most credible. Carlin was called by defendant to establish prescription. He was one of the developers of the subdivision. This witness testified that he visited with defendant concerning possible sale of the lots to him in late 1973 or early 1974, he could not remember when. He testified to having seen the use of a portion of the back of Lot 12, an area estimated by him to be 20' to 25' deep, for storage of metal material. He estimated two or .three tons of metal there, at a point close behind defendant’s shop and house. He did not think there was anything on Lot 11. He was certain there was nothing on Lots 10, 9 and 8. He said there was no further use of Lot 12 than this. He saw no evidence of clearing or dozer work, and he saw no road or driveway across Lot *246 12 or any other of these five lots. There was no work in progress on any of the five lots. When pressed to give the exact time that this observation occurred, Carlin was unable to do so. .
The public records indicate that defendant purchased these lots (not directly from Carlin but through an interposed party for tax purposes) on May 23, 1974.
The testimony of Carlin is illustrative of most of the testimony in this case, and the court accepts completely his description of activity in the area concerning the time he testified about, and accepts his version of the facts as the facts upon which the case is decided.
It is evident that some time in the past defendant began to use Lot 12 in connection with his business. Within six months prior to the filing of this suit when he dozed, cleared and shelled the property, his use of it has been obvious. Earlier, however, when he used only the back portion of it for storage, the use was not so obvious and could easily have escaped detection from the street. Neither defendant nor any of his witnesses was able to precisely identify the point in time when Lot 12 first began to be used as a passageway, or when the east end of Lot 12 first became used as a storage area. The earliest point in time at which it can be definitely established that a passageway existed was in September of 1974, when the pickets were established on Lyn-wood Avenue at that point. Even then it is not clear that it was a well-defined driveway, because it was not a well-defined driveway on the last day of the trial of this case. A. R. Walton, a licensed surveyor, and defendant’s last witness in the case, surveyed the property on the last day of trial and testified that there was a ‘driveway of a sort’ across Lot 12.
All of plaintiff’s witnesses testified that there was no driveway across Lot 12 at any time and that there was no observable use of Lot 12 or any of the lots for storage purposes during the time in question.”
The court concludes that the defendant has failed to prove a commercial use of the lots for the requisite period of two years and that for that reason, the violation of the restrictions must be enjoined.
While appellate courts in Louisiana have constitutional obligation to review both law and facts in civil cases, findings of fact by the trial judge shall not be disturbed absent a positive showing that the findings are manifestly erroneous on the face of the record. Storey v. State Farm Mutual Fire Insurance Company, 327 So.2d 687 (La.App. 1 Cir. 1976).
Stated in another context, where there is substantial conflict in the testimony, reasonable evaluation of credibility and reasonable inferences of fact made by the trier of fact, here the trial judge, should not be disturbed on appeal in the absence of manifest error. Pennington v. Panepinto, 328 So.2d 812 (La.App. 1 Cir. 1976). Additionally, where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed by the appellate court even though the reviewing court might believe its own evaluations and inferences are as reasonable. Weaver v. Fleetwood Homes of Mississippi, Inc., 327 So.2d 172 (La.App. 3 Cir. 1976).
There is language in Chexnayder v. Rogers, cited supra, suggestive that prescription will not run on a business which is conducted secretively and surreptitiously so as to avoid detection. There is certainly no evidence in the instant case that the defendant’s conduct or his use of these lots has ever been anything other than open and above board, and clearly there has been no effort to avoid detection. However, due to the initial limited use of the back portion of the lot for flat storage and the natural obstruction to view from Lynwood Avenue caused by trees and undergrowth on the lots, the court can appreciate the plaintiff’s contention that the violation was not open and obvious until the lots were cleared and large areas of them began to be put to use in late 1975.
If the mere storage of pipe under these circumstances was sufficient to commence the tolling of prescription, it would be im *247 possible to fix the exact point in time when the violation began.
Foy the above and foregoing reasons, we affirm the trial court’s judgment issuing a preliminary writ of injunction against defendant; appellant is cast with all costs.
AFFIRMED.

. Defendant also pleaded estoppel based upon the contention that plaintiff estopped himself from complaining by raising rabbits on his own property. This defense was not seriously pursued.