317 So.2d 222 (1975)
Carlton Joseph GUIDRY and Josephine Jolivette Guidry, Plaintiffs-Appellants,
v.
STATE of Louisiana, Through the DEPARTMENT OF HOSPITALS, et al., Defendants-Appellees.
No. 5001.
Court of Appeal of Louisiana, Third Circuit.
July 16, 1975.
Rehearing Denied August 28, 1975.
Writ Refused October 22, 1975.
*223 Edwards, Stefanski & Barousse by Homer E. Barousse, Jr., Crowley, for plaintiffs-appellants.
Lawrence W. Bell, Baton Rouge, for defendants-appellees.
Before FRUGE, HOOD and WATSON, JJ.
HOOD, Judge.
Mr. and Mrs. Carlton Joseph Guidry instituted this action for damages, alleging as the basis therefor that Mrs. Guidry was injured while she was a patient at the Lafayette Charity Hospital. Defendants are the State of Louisiana, through the Department of Hospitals, and the Lafayette Charity Hospital. Answers were filed, and one of the defendants, State of Louisiana, through the Department of Hospitals, reconvened seeking to recover from plaintiffs the value of the hospital and medical services furnished to Mrs. Guidry. The trial court rendered judgment rejecting the demands of all parties. Plaintiffs appealed.
The issues presented are whether Mrs. Guidry sustained the injuries of which she complains while in the hospital, and if so, whether the accident and resulting injuries were caused by the negligence of defendants' agents or employees.
Plaintiffs allege that Mrs. Guidry fell on April 1, 1970, while she was confined in the Lafayette Charity Hospital, and that as a result of that fall she sustained injuries consisting of the loss of her unborn child and fractures of the tibia and fibula of her right leg. She was 38 years of age at that time, and was in the last three or four months of her sixteenth pregnancy. She had given birth to fourteen living children and had had one miscarriage prior to that date.
Shortly before noon on March 31, 1970, Mrs. Guidry began to experience heavy vaginal bleeding while in her home in Rayne. She was transported by ambulance to Lafayette, and was admitted to the Lafayette Charity Hospital early that afternoon. At 3:30 P.M., shortly after she arrived *224 at the hospital, the attending physician determined that no "fetal heart tones" could be heard. Other examinations made at 4:00 P.M. that day and at 6:30 the next morning, April 1, also revealed that no fetal heart tones could be heard.
Dr. Richard M. Miers, who was interning in the obstetrical/gynecological services section of the hospital, made a complete physical examination of Mrs. Guidry at about 7:00 A.M. on the morning of April 1. That examination revealed that plaintiff had (1) a spiral fracture of the tibia and fibula of her right leg, (2) a condition known as "abrupcio placenta," and (3) blood deficiencies described as "hypofibrinogenemia" and severe anemia.
The condition known as "abrupcio placenta," according to Dr. Miers, results from the "premature separation of the placenta from the uterine wall of the mother." Normally the placenta separates after the baby is born. When it separates prior to the birth of the child, however, the mother has the condition called abrupcio placenta. The medical experts who testified agree that that condition almost always causes the death of the fetus. He defined "hypofibrinogenemia" as the loss of the substance in the blood which causes the blood to clot or to coagulate. He explained that this clotting factor in the blood is necessary and that the lack of it causes the patient to bleed profusely.
The treatment administered to Mrs. Guidry from the time she was admitted to the hospital until she was examined by Dr. Miers consisted principally of strict bed rest and blood transfusions.
Dr. Miers and Dr. O. William Hilton, Jr., were the only physicians who testified at the trial. Both were of the opinion that fetal heart tones would have been heard while Mrs. Guidry was in the hospital if her unborn child had been alive at that time. They agree that the fetus was not alive at the time Mrs. Guidry was admitted to the hospital.
Shortly after Dr. Miers examined Mrs. Guidry on the morning of April 1, a caesarean section was performed on her, and an eight ounce fetus, estimated to be from 20 to 22 weeks old, was removed from her uterus. The fetus was not alive. Her fractured right leg was put in a cast while she was under the general anesthesia.
Mrs. Guidry testified that at about 7:00 o'clock, or shortly thereafter, on the morning of April 1, 1970, she was instructed by Mrs. Hilda Mae Cudges, a nurse's aid in the hospital, to get out of bed in order that Mrs. Cudges could make up her bed. Plaintiff stated that she protested, but that Mrs. Cudges insisted that she get up, and that plaintiff thereupon got out of bed, took one or two steps and then sat on a chair in the room. At plaintiff's request, a bed pan was placed on the chair, and she sat on the bed pan. Mrs. Guidry testified that while in that position she told Mrs. Cudges that she was getting weak, that the nurse nevertheless insisted that plaintiff remain out of bed, and that plaintiff then lost consciousness for a few seconds. She stated that upon regaining consciousness she got back in her bed with the assistance of Mrs. Cudges, but that as she was doing so she noticed for the first time that her right leg was swollen and that it pained her. Within two or three hours thereafter Dr. Miers found that her leg was fractured. Mrs. Guidry has no recollection of having fallen, but she reasons that she must have sustained a fall while she was unconscious, since there appears to be no other explanation for her having sustained a fracture of her leg.
The testimony of Mrs. Cudges conflicts with that of plaintiff. Mrs. Cudges stated that she and Mrs. Leanna Wiltz, another nurse's aid, were in the room in which Mrs. Guidry was confined at the time the above incident occurred, and that they were preparing to take the "vital signs" of the patients and to give them their baths. While Mrs. Cudges' back was turned to plaintiff, another patient in the room cried *225 out "Nurse, watch," and Mrs. Cudges thereupon turned and saw that Mrs. Guidry was getting out of her bed without assistance. Mrs. Cudges went to plaintiff immediately and reminded her that she should not get out of bed, but plaintiff explained that she wanted to use the bed pan and that she couldn't use it while in bed. Mrs. Cudges said that plaintiff then appeared to get weak, so instead of putting her back in bed she helped her to sit in a chair which was next to the bed, and she called to Mrs. Wiltz and asked her to get Mrs. Wilda Robinson, a licensed practical nurse who was supervising the nurse's aids on that floor. Mrs. Cudges then stood in front of plaintiff while the latter was sitting in the chair and allowed her to rest her head on Mrs. Cudges' chest. A few seconds later plaintiff said that she was alright, and by that time Mrs. Wiltz and Mrs. Robinson were present. Mrs. Cudges, Mrs. Wiltz and Mrs. Robinson thereupon assisted plaintiff in getting back into her bed.
Mrs. Cudges stated that plaintiff did not fall at any time while she was in the hospital that morning, but that Mrs. Guidry told her that she had fallen previously "in the bathroom at home."
The testimony of Mrs. Cudges as to what occurred in plaintiff's hospital room that morning is supported by that of Mrs. Wiltz and of Mrs. Robinson. These witnesses also stated that a patient on strict bed rest is never ordered to get out of bed for any reason, and that they particularly are not required to get out of bed to allow the bed linen to be changed. They testified that the linen is changed easily while the patient remains in bed. The evidence also shows that Mrs. Guidry was receiving a blood transfusion when the above incident occurred, and that the intravenous tube which was attached to her arm began to leak when she got out of bed, causing blood to spill on the uniform of at least one of the nurses.
The trial judge found that Mrs. Guidry's expected child was deceased at the time she was admitted to the hospital, and that the loss of the fetus thus did not result from any act of defendants' agents or employees.
The evidence clearly supports those findings of the trial court. The testimony of the medical experts indicates that Mrs. Guidry had at least a partial abrupcio placenta before she left her home to go to Lafayette, and that that condition probably caused the bleeding which made it necessary for her to be taken to the hospital. The medical evidence is uncontradicted to the effect that an abrupcio placenta is almost always fatal to the unborn child, that no fetal heart tone could be heard when Mrs. Guidry was admitted to the hospital, and that the death of the fetus occurred before that time.
We conclude, as did the trial judge, that plaintiff's unborn child was deceased before the alleged fall occurred, and that defendants thus are not liable in damages for the loss of that child.
The trial judge also concluded that Mrs. Guidry did not sustain a fall while she was a patient in the hospital, as alleged, and that her leg fracture thus could not be attributed to the acts of defendants' employees.
There is no question but that Mrs. Guidry had a fracture of the tibia and fibula of her right leg when Dr. Miers examined her about 7:00 A.M. on April 1, 1970. The doctor testified, however, that although the fracture could have been very recent, it also "could have been at least a week or two old." The evidence does not indicate how or when the fracture was sustained, but defendants are not presumed to have negligently caused that injury simply because the fracture was discovered while she was in the hospital. Plaintiffs allege that the fracture resulted from a fall which Mrs. Guidry sustained on the morning *226 of April 1, 1970. The burden of proof rests on plaintiffs to show that such a fall occurred, that it was caused by the negligence of defendants' agents or employees, and that Mrs. Guidry's injuries resulted from that fall. The trial court held that plaintiffs failed to meet that burden.
The factual findings of the trial judge are entitled to great weight, and they will not be disturbed unless found to be clearly erroneous.
We cannot say that the trial judge erred in accepting the testimony of Mrs. Cudges, rather than that of Mrs. Guidry, as to what occurred in the latter's hospital room on the morning of April 1, 1970. The record shows that Mrs. Cudges had worked as a nurse's aid in the OB unit for 23 years. Even if we assume that she was as callous as plaintiff intimates, we find it difficult to accept Mrs. Guidry's statements that Mrs. Cudges ordered her to get out of bed unassisted while a blood transfusion was being administered to her, knowing that the intravenous tube would be pulled loose or would leak, and despite the fact that strict bed rest had been prescribed for her.
Our conclusion, like that of the trial judge, is that Mrs. Guidry did not sustain a fall in the hospital, as alleged. The fracture of her right leg thus did not result from an accident which occurred while she was a patient in the Lafayette Charity Hospital.
Plaintiffs contend, however, that even though Mrs. Guidry's version of the accident is rejected, defendants nevertheless are liable for the damages they sustained because of the negligence of defendants' employees in failing to use guard rails on Mrs. Guidry's bed while she was in the hospital.
We find no merit to that argument for at least two reasons. First, we have determined that the loss of Mrs. Guidry's unborn child and the fracture of her right leg did not result from a fall or any other incident which occurred in the hospital. The evidence thus fails to show any causal connection between her injuries or her physical condition on the morning of April 11, 1970, and any act of defendants' employees. Second, even if there should be some connection between the loss of Mrs. Guidry's unborn child or her leg fracture and the fact that she got out of bed on the above date, the evidence nevertheless fails to show negligence on the part of defendants' employees in failing to use guard rails on plaintiff's hospital bed under the circumstances presented here.
A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. It is a hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care which it owes to a particular patient depends upon the circumstances and the facts of that case. Hunt v. Bogalusa Community Medical Center, 303 So.2d 745 (La.1974); DeBlanc v. Southern Baptist Hospital, 207 So.2d 868 (La.App. 4 Cir. 1968); Killgore v. Argonaut-Southwest Insurance Company, 216 So.2d 108 (La.App. 2 Cir. 1968); Smith v. West Calcasieu-Cameron Hospital, 251 So.2d 810 (La.App. 3 Cir. 1971).
A private hospital is not an insurer of a patient's safety, and the rules as to the care required are limited by the rule that no one is required to guard against or take measures to avert that which a reasonable person under the circumstances would not anticipate as likely to happen. Killgore v. Argonaut-Southwest Insurance Company, supra.
*227 In the instant suit the evidence shows that Mrs. Guidry was relatively young and alert while she was in the hospital. There is nothing to indicate that she had been administered any drugs which would cause her to become disoriented, confused or mentally incapacitated. Plaintiff's testimony, in fact, emphasizes the fact that Mrs. Guidry had all of her mental faculties and was capable of making rational decisions while in the hospital. She knew that strict bed rest had been prescribed for her, and she stated that when Mrs. Cudges required that she get out of bed she protested. The hospital had no reason to believe that plaintiff would act irresponsibly because of panic or ignorance, particularly since she had experienced 15 pregnancies before this incident occurred, including one miscarriage. Considering Mrs. Guidry's age, her physical condition and her alertness, it also would appear that guard rails would not have prevented her from getting out of bed if she had made up her mind to do so.
Under the circumstances presented here, we find that defendants were not negligent in failing to use the guard rails on plaintiff's hospital bed.
Our ultimate conclusion, like that of the trial judge, is that the evidence fails to establish negligence on the part of defendants, or of their agents or employees, and that it does not show a causal connection between the loss of plaintiff's unborn child or her leg fracture and any incident which may have occurred while she was in the defendant hospital. The trial judge held, correctly, therefore, that plaintiffs are not entitled to recover damages from defendants.
For the reasons assigned, the judgment appealed from is affirmed. The costs of this appeal are assessed to plaintiffs-appellants.
Affirmed.