350 So.2d 240 (1977)
William J. MOREAUX, Individually, etc., Plaintiff-Appellee,
v.
ARGONAUT INSURANCE COMPANY, Defendant-Appellant.
No. 6122.
Court of Appeal of Louisiana, Third Circuit.
August 30, 1977.
Rehearing Denied October 11, 1977.
Writ Refused November 11, 1977.
*241 Stockwell, Sievert, Viccellio, Clements & Shaddock, by Robert W. Clements, Lake Charles, for defendant-appellant.
Russell T. Tritico, Lake Charles, for plaintiff-appellee.
Before CULPEPPER, GUIDRY and FORET, JJ.
FORET, Judge.
This appeal was filed by Argonaut Insurance Company (the insurer of St. Patrick Hospital in Lake Charles, Louisiana), the defendant in this suit in which plaintiff, William J. Moreaux, on behalf of himself and his two minor children, Kimberly Kristina and Maricia Rachelle, alleges the malpractice of the insured resulting in the death of his wife, Bonita Moreaux. The case was tried before a jury which returned judgments in favor of the two minor children in the amount of $50,000.00 each, and judgment against the plaintiff husband-father dismissing his demands. We reverse in part and affirm in part.
In the morning and afternoon of July 4, 1974, Bonita Moreaux, her husband, William, and her brother and sister-in-law, the Bernon Doucets, went to a park, celebrated the national holiday, and had a picnic. In the late afternoon they returned to their respective homes and attired themselves for the evening. In midevening at about 8:00 or 9:00 o'clock P.M., in the Moreaux vehicle, they traveled to the Bamboo Lounge in Lake Charles, Louisiana, where the two couples danced and partook of alcoholic beverages.
In the early morning hours of July 5, at approximately 1:00 o'clock A.M., although Bonita relentlessly expressed her intention to continue partying, the two couples departed to the Bernon Doucet household and the Moreauxs picked up their children. At the driveway, the Moreauxs argued as to who was to operate the motor vehicle on the trip homeward. A settlement, by which William would operate the automobile, was finally reached. However, Bonita then refused to allow William to stay overnight in their trailer. After he brought Bonita and the children home, William went to Jennings, where he stayed overnight in his sister's home. (The incident, the Moreauxs sleeping in different households, was not an unusual occurrence. It had happened a number of times before. In fact, William and Bonita had just recently reconciled after a short period of separation.)
Bonita Moreaux was a young (in her twenties), aggressive, obstinate, and strongly built woman who suffered from the disease known as petit mal epilepsy, for the treatment of which the medication Mysoline had been prescribed. This woman had suffered stages of depression, for which she had, on at least one prior occasion, attempted suicide. In the early morning of July 5, *242 1974, consuming an excess dosage of Mysoline and cutting her wrists, she again attempted to kill herself.
Bonita was transported by ambulance to the emergency care unit of St. Patrick's Hospital in Lake Charles. There she was treated by Dr. Buttross (a specialist in the fields of cardiology and internal medicine), who had once before treated her for an overdose of medication. After his initial examination and treatment, and after Bonita had been hospitalized one day in the unit, Dr. Buttross recommended Bonita's transfer to an area of the hospital known as "Five North" under the care and supervision of Dr. Gilles Morin, a psychiatrist.
For about one-half hour, in the emergency care unit, Dr. Morin examined Bonita. She was then transferred to Five North, the psychiatric ward of St. Patrick's Hospital. For another one-quarter hour, in the morning and midnight of July 7, he again treated the patient. From his short interviews, Dr. Morin opined that Bonita was not psychotic; that she knew that psychiatric treatment had been provided her, and the reasons therefor; that she was not depressed, but rather somewhat excited over the prospect of treatment; and he prescribed medicationMysoline and Librium, a mild tranquilizerfor her treatment.
While Bonita occupied the emergency care unit and Room No. 556 of Five North, she was visited very often by her parents, the Fred Doucets, and her husband William, and constantly cared for by employees of St. Patrick's. The nurses who treated her, and her father were of the opinion that as time passed, Bonita's condition improved she became physically and mentally stronger. She showed signs of optimism, of a hope for the future.
At midnight on July 8, Mattie McVay, a nurses' aide, made a check of Room No. 556, the room in which Bonita was hospitalized. She found Bonita hanging from the shower rod, a cord around her neck, her face toward the tub, her feet above the floor, and her hands tied, palms facing her thighs. A sheet or sheets and a pillow or pillows, from her bed, and an overturned wastepaper basket were seen in the shower. Bonita was immediately removed from the bathroom and placed on her bed. Because her hands were so tightly tied, the cutting of the cords around her arms was required before any emergency care could be provided. All emergency rescue operations proved fruitless. Dr. Davidson pronounced Bonita dead.
As the death was mysterious, and as the hospital rules so required, an autopsy was conducted upon the body of Bonita Moreaux. Dr. Louis Remus, pathologist, discovered pressure marks around the neck and wrists (indicative of a typical strangulation); healing cuts around the wrists; no finger marks on the neck; contusions in the periorbital regions of the face; purplish discolorations around the face; that Bonita had had sexual intercourse within several hours of her death; and concluded that the death was due to strangulation. (The death certificate was not admitted into evidence and the time of death was not established.)
Unless the record demonstrates that the jury's conclusions of fact are not supported by the evidence and/or its application of law is clearly erroneous, we should affirm the judgment of the jury. Garrison v. Hotel Dieu, 319 So.2d 557 (La.App. 4 Cir. 1975), writ denied, La., 323 So.2d 129; Duray v. Continental Insurance Company, 311 So.2d 491 (La.App. 4 Cir. 1975); Mayes v. McKeithen, 213 So.2d 340 (La.App. 1 Cir. 1968); cases too numerous to cite. In this case, as the jury did not have to provide written reasons for the judgment and as no written interrogatories were propounded to it so that its factual conclusions could be determined, we do not know what factual conclusions the jury reached.
In the case of Hunt v. Bogalusa Community Medical Center, 303 So.2d 745, 747 (La. 1974), the Louisiana Supreme Court succinctly stated the law which should be applied in this case:
"A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. It is the hospital's duty to protect *243 a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and facts of that case." Williams v. Sisters of Incarnate Word of Galveston, Tex., 341 So.2d 1299 (La.App. 3 Cir. 1977); Jenkins v. Bogalusa Community Medical Center, 340 So.2d 1065 (La.App. 1 Cir. 1976); Pettis v. State, Dept. of Hospitals, 336 So.2d 521 (La.App. 3 Cir. 1976), modified, La. App. 3 Cir., 340 So.2d 1108; Guidry v. State, Dept. of Hospitals, 317 So.2d 222 (La.App. 3 Cir. 1975), application denied, La., 320 So.2d 904.
However, Louisiana jurisprudence has limited the above general rule of the duty of a hospital.
". . . A private hospital is not an insurer of a patient's safety and the rules as to the care required are limited by the rule that no one is required to guard against or take measures to avert that which a reasonable person under the circumstances would not anticipate as likely to happen." Goodeaux v. Martin Hospital, Inc., 333 So.2d 717 (La.App. 2 Cir. 1976), writ denied, La., 338 So.2d 295; Williams v. Sisters of Incarnate Word of Galveston, Tex., supra; Jenkins v. Bogalusa Community Medical Center, supra.
"The duty owed by a hospital to its patients is to exercise the degree of care, skill and diligence used by hospitals generally in that community." Pettis v. State, Dept. of Hospitals, supra, at page 531; Charouleau v. Charity Hospital of Louisiana at New Orleans, 319 So.2d 464 (La.App. 4 Cir. 1975), writ denied, La., 323 So.2d 137; Lauro v. Travelers Insurance Co., 261 So.2d 261 (La.App. 4 Cir. 1972).
As to what degree of care a hospital owes to its patients, a review of several cases in Louisiana jurisprudence may be of interest. In Williams v. Sisters of Incarnate Word of Galveston, Texas, supra, the symptoms of a 13-year old hospitalized patient were dizziness and fainting. When that patient announced that she wished to bathe, the nurse stated that she would aid in that endeavor. The patient's mother advised the nurse that she would provide all the aid that was needed. The patient, after the bath, dressed in the bathroom and, while walking back to her bed, felt dizzy and collapsed, injuring herself. This Court ruled that as the mother had undertaken to provide the amount of care that her daughter's condition required, the defendant hospital was not so obligated.
In Jenkins v. Bogalusa Community Medical Center, supra, the plaintiff, suffering from gouty arthritis, was admitted as a patient in defendant hospital. Plaintiff's medical condition did not enable him to walk with ease, but only with the greatest of difficulty. The employees of defendant placed rails around the bed of plaintiff and advised plaintiff not to get out of bed without signalling for assistance. In direct disobeyance of the orders of the hospital, plaintiff got out of bed, walked to the bathroom, and on the return trip to the bed, fell. The First Circuit Court of Appeal held that the defendant hospital was not liable, as the hospital provided routine services in accordance with the standard of care commensurate with that prevailing in hospitals in the general area. As defendant exercised the amount of care required by plaintiff's medical condition, and as plaintiff was fully aware of his surroundings, being mentally capable, he should have reasonably anticipated that which befell him.
In the case of Hunt v. Bogalusa Community Medical Center, supra, plaintiff had undergone surgery for the removal of his gall bladder and was incapable of walking, or of balancing himself without assistance. Two partial rails were placed on his bed. Plaintiff, an aged person, fell from the bed and sustained serious injuries. The Louisiana Supreme Court, in ruling that defendant hospital did not exercise that degree of care required because of the patient's condition, rendered judgment in favor of plaintiff.
*244 From a close scrutiny of the evidence in the record, we conclude that the death of Bonita Moreaux was, more likely than not, a case of homicide rather than suicide. The method by which her hands were tied palms facing the thighs, the cords wrapped around her wrists and legs, pulled under her crotch, and around her waistand the degree of tightness with which the cords were tied made it an almost physical impossibility for Bonita Moreaux to have taken her own life. The medical opinion of Dr. Morinthat Bonita exhibited signs of a longing for the future, the antitheses of one possessing suicidal tendenciesand that of lay witnesses also corroborates our so holding.
In the record, evidence was presented as to what precautionary measures were taken by another hospital in the general area, Memorial Hospital, to prevent a case of homicide. As to the ground entrances to the hospital, after 8:00 o'clock P.M., the only entrances open were the lobby, the emergency room entrance, and the employee entrance. As to the lobby entrance, the switchboard operator maintained constant surveillance. All other doors were locked from the outside. To open any door, a key was required. A twenty-four-hour-a-day security guard (a member of the Pinkerton Detectives) was employed. He had a daily regular routine and was equipped with a walkie-talkie with which he and the switchboard operator could communicate.
As to the ground entrances of St. Patrick's Hospital, in the evening (at approximately 9:00 o'clock P.M.) all entrances, other than the rear emergency room entrance, were locked. The front entrance was capable of being opened. It was a controlled access entrancethe switchboard operator maintained constant visual surveillance thereof and monitored the front doors; by the placing of her finger on a buzzer, the front door would be opened. Although there was no nurses' station between the rear emergency room entrance and an elevator, the entrance was monitored by nurses. The hospital maintained twenty-four hour staffing. There was never a patient care area in the hospital that lacked personnel. A security guard always worked between the hours of 8:00 o'clock P.M. and 4:00 o'clock A.M. and was equipped with a voice beeper with which he and the switchboard operator could communicate.
It was, however, possible for a person to ascend from the elevator near the rear emergency room entrance to Five North and to traverse the halls thereof to Room No. 556 without ever being seen. At 11:20 o'clock P.M. July 7, Mattie McVay, nurses' aide, saw a "young man" in Room No. 556. At 12:00 o'clock midnight, the man was not in the room. No one had seen him enter into, nor depart from it.
A person alighting from the elevator at Five North could traverse through one of two passageways to reach Room No. 556. In one passageway (No. 1) he would walk directly in front of the nurses' station prior to the time in which he would reach the desired destination. In the other passageway (No. 2), he would walk through unlocked doors, through long halls, and ultimately reach Room No. 556 without ever having passed the nurses' station. (P-13)
*245 
*246 On the night of the death of Mrs. Bonita Moreaux, there were fifteen patients in Five North. The eleven-to-seven shift was composed of three (3) employees. They were Mrs. Mattie McVay, nurses' aide, Mrs. Gladys Miller, nurses' aide, and Marybelle Rideaux, L.P.N. According to the general floor policies of Five North, they were to constantly traverse the halls, to make bedchecks of all of the patients on a regular thirty-minute basis, and to ascertain the identity of all visitors. (P-20) On the night in question, the 11:00 o'clock P.M. and the 12:00 o'clock midnight bedchecks were made, but the 11:30 o'clock P.M. bedcheck was not made. The identity of the visitor in Room No. 556 at 11:20 o'clock P.M. was never discovered. Mrs. Moreaux, however, was seen at 10:45 o'clock P.M. and at 11:20 o'clock P.M. At the earlier time, she walked out of her room and went to the door of the nurses' station; at the later time, Mrs. McVay, after having responded to a call from a patient in an adjoining room, passed by Room No. 556, the door of which was slightly ajar, and looked in. She saw a body lying in the bed and the back of a man standing at the head of the bed. In her statement given to the police, Mrs. McVay said that she saw the faces of Bonita and her husband, and that the latter persons made signs of recognition. In her testimony, however, she said that the statement was true of the night before the death, and not of the night of the death.
The room in which Bonita Moreaux was hospitalized was no different from any other room in the hospital as regards furnishings. The room was furnished with draperies, the nylon cord of which was used in the homicide, and bed lamps, an electrical cord of which was tied around the body of Bonita Moreaux, binding her hands and wrists.
St. Patrick's Hospital was a private medical institution which could accommodate up to 246 patients. In July, 1974, it was accredited by the Joint Commission on Accreditation of Hospitals. Although the accreditation was purely voluntary, it represented a per se compliance with the standards required to secure a hospital license from the State of Louisiana. In order to be so accredited, a hospital had to comply with strict guidelines as to the overall facilities, nursing care, and special care units of the Commission. In 1974, compliance was determined by a committee (a doctor, nurse, and/or hospital administrators) which spent semi-annually a two (2) or three (3) day period in which it reviewed the different facilities of a hospital. Any lack of complete compliance with the guidelines resulted in a notice of deficiencies, which deficiencies had to be corrected within the stated time, or the hospital would lose its accreditation.
Although it housed only patients with mental problems and was a psychiatric ward, Five North did not fall within the classification of a Special Care Unit of the Joint Commission on Accreditation of Hospitals. A common element of that classification is that the patients therein are critically ill and require intensive nursing care. The Joint Commission had inspected Five North a number of times and, at all such inspections, did not consider Five North a Special Care Unit, and found that Five North was not lacking in a proper staff, personnel, construction, and operation.
A hospital is an institution, the main concern and responsibility of which is the medical care of its patients. Its duties span no further than those perimeters. As to any breach of medical care, the hospital is liable. However, as to any circumstance in which a patient dies as a result of a homicide, the hospital cannot be held liable, unless it is shown that the patient's condition required constant surveillance, there was notice of a possible homicide as to such patient, and the hospital took no, or very little, precautions to prevent same. Were the law otherwise, the hospital would, in effect, be the insurer of the safety of all of its patients.
As stated heretofore, the degree of care which a hospital must provide should be commensurate with the patient's condition, mental as well as physical, and with the degree of care provided by hospitals in the general area. In this case, although *247 Bonita Moreaux had attempted suicide, Dr. Morin, the psychiatrist treating her, opined that she was not psychotic, was aware of her surroundings, in good spirits, and apparently out of danger of other suicidal attempts. From the very minimal evidence presented as to the care provided by other hospitals, we can but say that St. Patrick's Hospital provided similar quality services and precautionary measures. It is our opinion that St. Patrick's Hospital violated no legal duty to Bonita Moreauxalbeit whether she committed suicide or was killed by another person or persons.
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review, the appellate court should not disturb this factual finding in the absence of manifest error. Canter v. Koehring, 283 So.2d 716, 724 (La.1973). Accordingly, we must give great weight to the factual conclusions of the trier of fact, and reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. However, in the case at bar, a careful review of the record strongly convinces us that the verdict of the jury was manifestly erroneous, and the judgment rendered as a result of the said verdict should be reversed. We conclude that there was no reasonable factual or legal basis upon which a jury verdict could be rendered against Argonaut Insurance Company, the insurer of St. Patrick's Hospital.
Accordingly, we reverse the judgment of the trial court holding that defendant-insurer, Argonaut Insurance Company, was liable to the two minor children of Bonita Moreaux in the sum of $50,000.00 each, and we affirm the judgment of the trial court rejecting the demands of William Moreaux.
All costs of this appeal are to be borne by plaintiff-appellee.
REVERSED IN PART AND AFFIRMED IN PART.