Diana Deville **GUILLORY, individually and on Behalf of her minor child, David P. GUILLORY, Jr., Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 82–3049.

United States Court of Appeals, Fifth Circuit.

March 11, 1983.

Rehearing Denied April 4, 1983.

---

Poteet & Landry, Walter J. Landry, Lafayette, La., for plaintiff-appellant.

Claude W. Bookter, Jr., Dosite H. Perkins, Jr., Joseph S. Cage, Jr., Asst. U.S. Attys., Shreveport, La., for defendant-appellee.

Before JOHNSON, WILLIAMS and JOLLY, Circuit Judges.

JOHNSON, Circuit Judge:

Diana Deville Guillory, individually and on behalf of her minor son, David Guillory, Jr., initiated this action pursuant to the Federal Tort Claims Act (FTCA) alleging that her husband, and the young boy's father, David Guillory, Sr., died as a result of the negligence of the United States through the Veterans Administration (VA) and its agents in the VA hospital in Houston, Texas. The case was tried before a federal district court in Louisiana, which applied Texas law and awarded the plaintiff $1200 for funeral expenses, noting that additional damages were not recoverable under Texas law. This court, concluding that Louisiana law bears the most significant relationship to the occurrence *sub judice,* reverses the district court's decision and remands the case to the district court for a new trial on the issue of damages as provided for under Louisiana law.

## I. *Facts*

In 1975, David Guillory, Sr., a member of the armed forces, was diagnosed as suffering from acute schizophrenia, a permanent and incurable condition. Guillory, who had joined the Army while living in Louisiana, was awarded a 100% service connected disability by the Disability Determinations Office for the VA in Shreveport, Louisiana, and began receiving disability benefits.

On or about May 24, 1978, Guillory voluntarily admitted himself to the VA hospital in Houston, Texas. He was suffering from active auditory hallucinations, posturing, thought disorders, chaos, and delusions of persecution. Guillory was given Thorazine, Stelazine, Cogentin, and Prolixin, drugs he had been given since the diagnosis of his condition in 1975.[1] Unfortunately, Guillory's condition took a turn for the worse and on August 11, 1978, his medication was increased.

On August 17, 1978, Guillory was found unconscious on the hospital floor by the nursing staff and was placed in restraints in a chair. Concluding that Guillory had suffered an oversedation attack, the doctors reduced his dosage of Prolixin. However, the expert testimony indicates that Guillory had become so saturated with Prolixin that the drug was still in his system on the date of his death, almost two days later, in quantities in excess of the reduced dosage.

Even though Guillory had suffered this loss of consciousness on August 17, the VA hospital released him on a weekend pass the following day. At the time of his release, Guillory's medical records indicated that his prescription consisted of Lithium Carbonate, 300 milligrams, four times per day, Prolixin, 25 milligrams, three times per day, and Cogentin, two milligrams, twice per day. The Thorazine had been discontinued. Although the VA personnel gave the prescriptions to Guillory's wife and instructed her to see that he took his medication, they failed to adequately warn her of the potential reaction Guillory might suffer from the drugs and, surprisingly, the VA personnel made no mention of his debilitating drug reaction the previous day. Guillory and his wife returned to Louisiana for the weekend on August 18, 1978.

On the hot, summer Saturday of August 19, 1978, in Lake Charles, Louisiana, Guillory went for a motorcycle ride with his cousin. Guillory's cousin hit a hole in the road while on his motorcycle and was involved in an accident. During the course of police investigation, it was discovered that Guillory's driver's license had been suspended; he was then arrested, handcuffed, and placed in a patrol car. Although Guillory appeared normal when placed in the patrol car, by the time it arrived at the sheriff's office, he had slumped back in the seat and could not be aroused. Guillory was transported to the hospital by ambulance, where he later died. His temperature immediately prior to death was 106 degrees.

At trial, several doctors took the stand and testified concerning the probable cause of Guillory's death. Accepting the testimony of the plaintiff's expert witnesses, the district court concluded that, in 1978, it was well known that some of the drugs given Guillory would cause sweat inhibition and a high body temperature. Thereafter, noting Guillory's extremely high temperature prior to death, the district court concluded: "Having found by a preponderance of the evidence that the decedent's death was caused by heat stroke, the court has no difficulty in finding that but for the drugs in the decedent's system, the heat stroke probably would not have occurred." This finding led the district court to the ultimate conclusion that "it was negligence on the part of the hospital and its employees in failing to advise the decedent's family that he should not be exposed to warm temperatures while under the medications prescribed, particularly Cogentin." This ultimate finding of negligence is unchallenged.

---

1. All of these drugs are used to treat individuals with psychotic disorders. The record indicates that these drugs have a significant effect upon the nervous system and are strong sedatives. The medical community concludes that heavy sedation is the easiest way to deal with such emotionally disturbed individuals. In the instant case, the record indicates that Guillory was given very large dosages of these drugs.

## II. *The Conflict of Laws Issue*

The pivotal issue before this Court is whether the district court erred by concluding that Texas law was applicable to this controversy. The federal district court in Louisiana recognized the importance of this issue and noted:

The selection of which state's law shall apply is crucial. If it be Texas, there can be no recovery for loss of love and affection under its death statute. On the other hand, Louisiana allows recovery for loss of love and affection to the named beneficiaries under Article 2315 of the Louisiana Civil Code. . . .

The district court concluded that Texas law bore the most significant relationship to the occurrence at issue and, accordingly, the widow's and minor child's recovery was limited to $1200 in funeral expenses.

■ Both parties concede, as they must, that the Texas choice of law rules govern the conflict of laws issue in this case. Indeed, since this case is founded upon the FTCA, there can be no doubt that the place where the acts or omissions occurred determines which state's choice of law rules apply. *See Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Underwood v. United States*, 356 F.2d 92, 99 (5th Cir.1966). It is undisputed that the acts and omissions ultimately leading to David Guillory's death in Louisiana occurred in Houston, Texas, when the VA doctors sent the Guillorys back to Louisiana with the decedent's medication, but without the knowledge necessary to safely administer the prescribed drugs to the decedent. Hence, Texas choice of law rules determine which state's substantive law governs the rights of the litigants.

■ In 1979, in a unanimous decision, the Supreme Court of Texas made a major change in that state's choice of law analysis.

Rejecting the long-standing doctrine of *lex loci delicti*, the Texas court adopted "the most significant relationship test" as set forth in sections 6 and 145 of the Restatement (Second) of Conflicts. *See Gutierrez v. Collins*, 583 S.W.2d 312 (Tex.1979). In applying the Texas choice of law analysis, this Court and the Texas Supreme Court have emphasized that the ultimate decision does not "turn on the number of contacts the event had with each jurisdiction, but, more importantly, on the qualitative nature of those contacts as they are affected by the policies of the rule." *Crim v. International Harvester Co.*, 646 F.2d 161, 163 (5th Cir.1981); *Gutierrez v. Collins*, 583 S.W.2d at 319. Additionally, this Court has held that the district court's decision on the choice of law issue will not be reversed unless it is "against the more cogent reasoning of the best and most widespread authority." *Harville v. Anchor-Wate Co.*, 663 F.2d 598, 601 (5th Cir.1981). Nevertheless, this Court must conclude, in light of the policy reasons set forth below, that the district court erred by concluding that Texas law bore the most significant relationship to the occurrence in question.

As the Texas Supreme Court noted in *Gutierrez*, section 6 of the Restatement (Second) of Conflicts sets out the general principles to be applied in determining which state's law has the most significant relationship to the occurrence in question, including: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations,[2] and (e) the basic policies underlying the particular field of law. Furthermore, due consideration must be given to the factors set forth

---

2. Although this consideration can weigh heavily in certain cases, it would appear to be of little importance in this case. As the comments to § 6 point out:

There are occasions, particularly in the area of negligence, when the parties act without giving thought to the legal consequences of their conduct or to the law that may be

applied. In such situations, the parties have no justified expectations to protect, and this factor can play no part in the decision of a choice-of-law question.

Restatement (Second) of Conflicts § 6, comment on subsection (2), g. Protection of justified expectations.

in section 145 as they relate to the principles set forth in section 6, which include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality of the parties, and (d) the place where the relationship between the parties was centered.

All of these considerations merit, and have received, careful consideration by this Court. However, as most conflict of laws scholars recognize, and, indeed, as the Restatement authors emphasize, "any rule of choice of law, like any other common-law rule, represents an accommodation of conflicting values." *See* Restatement (Second) of Conflicts § 6, comment on subsection (2), c. Rationale.

■ Initially, it is necessary to define the actual conflict of laws issue presented in this case. *See Baird v. Bell Helicopter Textron,* 491 F.Supp. 1129 (N.D.Tex.1980). The injury giving rise to the instant proceeding occurred in Louisiana. However, the conduct causing the injury occurred in Texas. Likewise, the domicile and residence of the plaintiff is definitely Louisiana, but the relationship between the parties was centered in Texas. Clearly, both states have legitimate policy interests in applying their respective substantive law. The true "niche" in this case, therefore, and the ultimate resolution of this most difficult issue, centers around the determination of which state's law will most effectively advance the recognized policy interests of both Louisiana and Texas.[3] The answer to this question will determine which state's law truly bears the most significant relationship to this case.

On the one hand, it is conceded that Texas has an interest in applying its law to this case since the acts giving rise to the district court's finding of negligence occurred in Texas. Texas certainly has a very real interest in forcing doctors within its boundaries to comply with the relevant Texas standard of care. On the other hand, Louisiana unarguably has a legitimate interest in assuring that its citizens are adequately compensated for injuries caused by doctors' substandard conduct. Louisiana, not Texas, will suffer the expense of providing for the widow and her child should a meaningful recovery not be possible.

Clearly, the district court was presented with a difficult policy decision. In determining which state's law bore the most significant relationship to the occurrence in question, the district court was required to weigh the relative strengths of the policies favoring application of each state's law. As noted, Texas has an interest in policing the conduct of its doctors and Louisiana has an interest in guaranteeing a just recovery for its citizens. A careful examination of these competing policies, however, leads this Court to the conclusion that application of Louisiana law most effectively promotes the needs of the interstate system, the relevant policies of Louisiana and Texas law and those states' interests in determining the issues in this case, and the basic policies underlying this field of tort law.[4]

3. Indeed, as the Restatement's authors note:
   In determining a question of choice of law, the forum should give consideration not only to its own relevant policies but also to the relevant policies of all other interested states. The forum should seek to reach a result that will achieve the best possible accommodation of these policies. The forum should also appraise the relative interests of the states involved in the determination of the particular issue. In general, it is fitting that the state whose interests are most deeply affected should have its local law applied.
   Restatement (Second) of Conflicts § 6, comments on subsection (2), f. Relevant policies of other interested states.

4. As the results of this Court's examination and subsequent discussion indicate, the qualitative nature of the contacts this case has with Louisiana law favor application of that state's law under four of the five principles outlined in § 6: (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; and (e) the basic policies underlying the particular field of law. Moreover, as is demonstrated in note 2, the only principle not advanced by application of Louisiana law—(d) the justified expectations of the litigants—does not appear to be applicable to this case. Finally, it is noted that two of the four considerations listed

The district court, in its opinion, correctly noted that, under Texas law, a hospital is under a duty to exercise "reasonable care" in its decision relating to discharge and supervision of its patients. The case cited for this proposition by the district court states:

Simply stated, a hospital is under a duty to exercise reasonable care to safeguard the patient from any known or reasonably apprehensible danger from himself and to exercise such reasonable care for his safety as his mental and physical condition, if known, may require.

*Harris v. Harris County Hospital District,* 557 S.W.2d 353, 356 (Tex.Civ.App.—Eastland 1977, writ ref'd n.r.e.) (*quoting Bornmann v. Great Southwest General Hospital, Inc.,* 453 F.2d 616, 621 (5th Cir.1971)). Significantly, this standard of care is not substantially different from the corresponding Louisiana standard of care. For example, in *Hunt v. Bogalusa Community Medical Center,* 303 So.2d 745, 747 (La.1974), the Louisiana standard was stated as follows:

A hospital is bound to exercise the requisite amount of care toward a patient that the particular patient's condition may require. It is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control.

*See also Daniels v. Conn,* 382 So.2d 945, 949 (La.1980); *Ray v. Ameri-Care Hospital,* 400 So.2d 1127, 1138 (La.App.—1st Cir.1981), *writ denied* 404 So.2d 277 (1981).[5] Hence, in determining which state's law bore the most significant relationship to the occur-

rence in question, it is apparent that the standard by which the doctors' conduct would be evaluated would be essentially the same under both Texas and Louisiana law. Thus, Texas' interest in policing the conduct of its doctors is of diminished consequence. No true "conflict of laws" exists on this aspect of the case. Both states simply require the doctor to act reasonably under the peculiar facts and circumstances of each patient's case. Therefore, no grave injustice would be done to the public policy of Texas by application of Louisiana law. The Texas doctors would still be required to exercise reasonable care in the supervision and discharge of their patients. When this fact is combined with Louisiana's strong recognized interests in protecting its citizens and providing them with a just recovery, it becomes apparent that Louisiana law bears the most significant relationship to the occurrence in question.

Louisiana has a strong interest in insuring that its citizens and residents are adequately compensated for others' tortious conduct. This recognized interest was unarguably applicable in this case. The record indicates that the decedent, his wife, his son, and their families were all domiciled in Louisiana; they were residents and citizens of that state. The decedent had lived virtually all of his life in Louisiana, had attended school in Louisiana, and had worked in Louisiana. His home address was listed as Louisiana for federal tax purposes. As previously noted, he entered the armed forces in Louisiana and was determined to be disabled by the Disability Determinations Office for the VA in Shreveport, Louisiana. Additionally, it was noted

in § 145 lend further support for application of Louisiana law—(a) the place where the injury occurred, and (c) the domicile, residence, and nationality of the parties.

**5.** Although the Texas and Louisiana cases may state the standard of care in semantically different manners, it is clear that both states simply require a hospital to act in a reasonable manner under the peculiar circumstances of each patient's case. *See Harris v. Harris County Hospital Dist.,* 557 S.W.2d at 356; and *cf. Guidry v. State Dep't of Hospitals,* 317 So.2d 222, 226 (La.App.—3d Cir.1975), writ refused

Oct. 22, 1975 ("the rules as to the care required are limited by the rule that no one is required to guard against or take measures to avert that which a reasonable person under the circumstances would not anticipate as likely to happen."); *see also Goodeaux v. Martin Hospital,* 333 So.2d 717, 719 (La.App.—2d Cir.1976); *Williams v. Sisters of Incarnate Word, Etc.,* 341 So.2d 1299, 1300 (La.App.—3d Cir.1977); and *Moreaux v. Argonaut Insurance Co.,* 350 So.2d 240, 243 (La.App.—3d Cir.1977) writ refused Nov. 11, 1977.

at oral argument that the decedent was initially treated after his honorable discharge by doctors in the VA hospital in Alexandria, Louisiana. In fact, when Diana Guillory sought to obtain medical care for the decedent in 1978, she called the VA hospital in Alexandria but was referred to the VA hospital in Houston, Texas, apparently due to the unavailability of bed space in the VA hospital in Alexandria. Finally, it is once again noted that the injury resulting in the decedent's death occurred in Louisiana and that he was buried in Louisiana. Simply put, the record demonstrates that the decedent went to Texas temporarily for what he hoped would be abbreviated treatment. Against the backdrop of all of the aforementioned contacts the decedent had with his home state of Louisiana, he went to Texas solely for anticipated temporary hospitalization, which actually consumed only three months. Consequently, the district court should have placed great weight upon the fact that Louisiana citizens were involved in this case. Louisiana citizens bear the burden of the tortious conduct in the instant case; they should, therefore, be entitled to the opportunity to obtain the meaningful recovery provided for under Louisiana law absent countervailing circumstances requiring application of Texas law.[6]

As demonstrated, the primary interests and policy considerations favoring application of Texas law would not have been compromised through application of Louisiana law. In fact, application of Louisiana law would have advanced both Texas' interests in requiring its doctors to perform in a satisfactory manner and Louisiana's interests in adequately compensating its citizens for injuries inflicted upon them through others' tortious conduct. Although an application of Texas law would indeed require the Texas doctors to comply with the Texas standard of care, Louisiana's interest in providing its citizens with a just recovery would be drastically compromised. Therefore, since the policy considerations underlying Texas and Louisiana law could have best been advanced through application of Louisiana law, this Court must conclude that Louisiana law bears the most significant relationship to the occurrence in question and, hence, the district court erred in applying Texas law.

### III. *Conclusion*

This Court has concluded that the district court erred by applying Texas law to the case *sub judice*. Additionally, this Court has noted that the Texas and Louisiana standards of care in this type of case are virtually identical. Therefore, this Court can see no compelling reason to require a costly and duplicative retrial on the issue of liability. However, this case must be remanded so that the appellants can establish whatever recovery they are entitled to under applicable Louisiana law. Consequently, this Court reverses the district court's judgment and remands this case to the district court for a new trial on the issue of damages as provided for under Louisiana law.

**REVERSED AND REMANDED.**

---

**6.** This result is supported by the principles outlined in § 175 of the Restatement (Second) of Conflicts, which provides:

> In an action for wrongful death, the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

Restatement (Second) of Conflicts § 175. Indeed as the Restatement's comments note:

> The local law of the state where the injury occurred is most likely to be applied when the decedent had a settled relationship to that state, either because he was domiciled or resided there or because he did business there.

*Id.,* comment on § 175, f. When conduct and injury occur in different states.