**Joseph S. KNIGHT, Sr., and Bette J. Knight, Plaintiffs,**

v.

**DEPARTMENT OF the ARMY, Defendant.**

**No. SA 88 CA 874.**

United States District Court, W.D. Texas, San Antonio Division.

Jan. 15, 1991.

Jeffrey C. Anderson, San Antonio, Tex., for plaintiffs.

John F. Paniszczynn, Winstanley F. Luke, Asst. U.S. Attys., San Antonio, Tex., for defendants Department of the Army and the U.S.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GARZA, District Judge.

In essence, this Court is required to decide whether a reasonable person, prior to the availability of commercial tests to detect the presence of the Human Immunodeficiency virus ("HIV" virus)[1] in blood, would refuse surgery consisting of five coronary artery bypass graft (CABG) procedures and face an imminent heart attack in order to avoid the minimal, though deadly, risk of contracting the HIV virus.[2] Finding that a reasonable person would choose to assume the risk of surgery, this Court holds that Plaintiff has failed to establish the proximate cause element of his informed consent cause of action.

### I.

The facts of this case are essentially agreed upon by the parties. In 1984, Plaintiff, Joseph S. Knight, Sr. suffered from severe cardiac disease which necessitated surgical intervention. Cardiac catheterization performed at Eisenhower Army Medical Center, Ft. Gordon, Georgia, indicated stenosis (blockage) of a severe nature in at least three cardiac vessels. Mr. Knight's prognosis without surgical treatment was poor. Mr. Knight was given the choice of having his operation performed at Brooke

---

1. The term "AIDS" describes the full-blown manifestation of infection with the HIV virus, which results in a compromised immune system and the onset of often fatal opportunistic infections and other diseases which normally do not occur in the absence of immunologic compromise.

2. The risk of surgery includes the risk of blood transfusions which are almost always required during a CABG procedure. This was the case with Mr. Knight.

Army Medical Center (BAMC) at Fort Sam Houston in Texas; Walter Reed Army Medical Center in Washington, D.C.; or the Veterans Administration Hospital in Columbus, Georgia. He chose BAMC, and was flown by the military to that facility for surgery. Five CABG's were performed successfully on May 22, 1984.

Unfortunately, at the time of surgery, Plaintiff received a blood transfusion which was contaminated with the HIV virus. The blood was obtained from the Blood Center at BAMC, and had not been tested for the presence of the HIV virus before transfusion into Mr. Knight. Prior to surgery, Mr. Knight was not advised of (1) the risk of being exposed to the HIV virus from a blood transfusion; (2) the non-availability of a commercial test to detect the presence of the HIV virus in blood; and (3) the availability of autologous[3] or directed-blood transfusion programs.[4]

Plaintiffs, both Alabama residents, pursued all administrative remedies as required by 28 U.S.C. § 2675. Their claims were denied by the United States Army on February 22, 1988. Thereafter, suit was timely filed in this Court pursuant to the Federal Torts Claim Act (FTCA). 28 U.S.C. §§ 1346(b), 2671–2680. Prior to trial this Court granted Defendant's motion for partial summary judgment based on the Fifth Circuit opinion in *Valdiviez v. United States*, 884 F.2d 196 (5th Cir.1990), *reh'g denied* No. 88–5615 (5th Cir. Oct. 19, 1989), dismissing Plaintiffs' claims of vicarious liability and negligence in collecting and screening blood products. This Court now decides the matter of informed consent.

## II.

### A. *Choice of Law.*

Although the parties agree that the damage issue should be determined under Alabama law, the parties disagree whether Texas or Alabama law should govern the liability issues.

■ In a FTCA case, recovery is based on the law of the state where the alleged negligent act or omission occurred. 28 U.S.C. §§ 1346(b), 2674. This includes the "choice of law" of the state. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Guillory on behalf of Guillory v. United States*, 699 F.2d 781, 784 (5th Cir.1983). Texas choice of law applies the "most significant relations test." *Gutierrez v. Collins*, 583 S.W.2d 312 (Tex.1979).

As the Texas Supreme Court noted in *Gutierrez*, section 6 of the Restatement (Second) of Conflicts sets out the general principles to be applied in determining which state's law has the most significant relationship to the occurrence in question, including: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, and (e) the basic policies underlying the particular field of law. Furthermore, due consideration must be given to the factors set forth in section 145 as they relate to the principles set forth in section 6, which include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality of the parties, and (d) the place where the relationship between the parties was centered.

*Guillory*, 699 F.2d at 784–785 (footnotes omitted). This test applies to each element of the cause of action. *Webb v. Rogers Mach. Mfg. Co.*, 750 F.2d 368, 374 (5th Cir.1985) (applying Texas law); *Duncan v. Cessna Air Craft Co.*, 665 S.W.2d 414, 421 (Tex.1984).

**3.** Autologous blood transfusion is a practice whereby a patient who is going to have surgery donates blood for himself at some time prior to surgery. This blood is then preserved and readied for use.

**4.** Directed-blood transfusion is a practice where a prospective blood recipient finds volunteers who are willing to donate blood in his name. If those donors prove to be compatible, those units of blood are used preferentially in the event that the prospective recipient needs transfusion.

Initially, the Court must identify those qualitative factors relevant to the choice of the applicable rule of law. *Duncan,* 665 S.W.2d at 421. First, the evidence clearly establishes that the surgery and the acts or omissions surrounding the informed consent issue occurred in Texas. Second, although both Plaintiffs are residents of Alabama, Mr. Knight chose to come to Texas for his surgery. Mr. Knight could have reasonably expected that Army physicians performing surgery in Texas would be governed by Texas law. Conversely, he could have had no such reasonable expectation that these same physicians would be governed by Alabama law. Third, the transmission of the HIV virus into Mr. Knight occurred in Texas, although his death occurred in Alabama. Fourth, the Court finds that medical care of Mr. Knight since surgery has taken place in Alabama.

■ Although Alabama has an interest in seeing that its residents are fully compensated for their damages, Alabama has no interest in having physicians in Texas comply with Alabama medical standards. In contrast, Texas has a direct and important interest in seeing that surgeons practicing in Texas comply with reasonable standards of their profession in this state. Furthermore, Plaintiffs concede that both Alabama and Texas law apply the same objective standard in determining informed consent, and would reach the same results.

Accordingly, applying the Texas choice of law principles, the Court determines that Texas law applies to the liability issues. *See Transco Leasing Corp. v. United States,* 896 F.2d 1435, 1444–45 (5th Cir.) *amended on reh'g in part, reh'g denied in part,* 905 F.2d 61 (5th Cir.1990) (amended to allow the award of post-judgment interest).

### B. *Informed Consent.*

Plaintiffs allege that Defendant's physicians were negligent for failing to inform Mr. Knight of the risk of transmitting the HIV virus through blood transfusions and for failing to inform him of the possible use of autologous or directed-blood transfusions.

■ In Texas, a physician has the duty to make certain disclosures prior to surgery in order to obtain an informed consent from his patient. Tex.Rev.Civ.Stat.Ann. art. 4590i § 6.02 (Vernon Supp.1991).

In a suit against a physician or health care provider involving a health care liability claim that is based on the failure of the physician or health care provider to disclose or adequately to disclose the risks and hazards involved in the medical care or surgical procedure rendered by the physician or health care provider, the only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced *a reasonable person in making a decision to give or withhold consent.*

*Id.* (emphasis added); *Barclay v. Campbell,* 704 S.W.2d 8, 9–10 (Tex.1986). A plaintiff must establish not only that a defendant has breached that duty, but also must convince the trier of fact that such breach was a proximate cause of his injuries. *McKinley v. Stripling,* 763 S.W.2d 407, 409–410 (Tex.1989).

■ The issue of proximate cause is an objective standard:

The inquiry must be whether a reasonable person, not a particular plaintiff, would have refused the treatment or procedure had he been fully informed of all inherent risks which would influence his decision.

*Id.* at 410; *see also, Valdiviez,* No. 88–5615, Slip op. at 2 (5th Cir. Oct. 19, 1990) (order denying petition for rehearing).

### (1) *Duty to disclose risk of transmitting the HIV virus.*

■ The experts' conflicting testimony paralleled the conflicting positions of the parties on whether a physician had the duty to disclose the risk of transmitting the HIV virus through a blood transfusion in 1984. Plaintiff's expert, Thomas J. O'Connell, M.D., a San Fransisco physician, stated emphatically that failure to inform a patient in May of 1984 of this possibility fell below the accepted standard of care,

while the Defendant's expert, Dr. J. Kent Trinkle, a San Antonio physician, just as emphatically testified that it did not. Dr. O'Connell testified that in 1984 the medical community strongly suspected, though had not conclusively proven, that the HIV virus could be transmitted through blood or blood products. Dr. Trinkle would only admit that it was a "theoretic problem" in 1984. Both experts agreed, however, that there was no test commercially available in 1984 to detect the presence of the HIV virus in blood, and neither expert testified that failure to inform a patient of that fact fell below the acceptable standard of care. There was also no dispute between the parties that HIV is a deadly killer with no known cure. Accordingly, the Court finds that the failure to disclose the possibility of transmitting the HIV virus through a transfusion of infected blood in 1984 could have influenced a reasonable person in making a decision to give or withhold consent.

### (2) *Proximate Cause.*

Whether a reasonable person would have refused coronary bypass surgery even if informed of the possibility of transmitting the HIV virus through transfused blood, however, poses an entirely different question. Mr. Knight testified that he would have never given consent had he been informed of the possibility that the HIV virus could be transmitted through a blood transfusion. Mr. Knight indicated that even with cancer one has at least a fighting chance; with AIDS there is no chance of survival. Nonetheless, this Court must view all of the evidence, including Mr. Knight's coronary condition prior to surgery, to determine whether a reasonable person would have refused surgery under these conditions.

Both experts concluded that Mr. Knight's coronary disease posed a grave threat to Plaintiff. Dr. O'Connell agreed that Mr. Knight's bypass surgery, though not an emergency, was urgent, i.e., that a patient in his condition would not be sent home without surgery. Dr. Trinkle was more specific:

Without the operation he almost certainly would have had a heart attack at some point in time and probably would have subsequently died and/or been severely disabled. Now, we can't be clairvoyant to say at what particular point in time this would have occurred. I would have been surprised if he had gone more than a few weeks or a few months, however, without a major heart attack without the operation.

In essence, there was no choice but surgery if Mr. Knight desired to live for any extended period of time. The parties stipulated that the incidence or risk of transmitting the HIV virus through a blood transfusion was minimal—ranging between 1 in 500,000 and 1 in 7,000,000. Nonetheless, because no testing was available in 1984, this information was not available either to Mr. Knight or his physicians. The Court can only rely on Dr. O'Connell's testimony that in San Francisco, where there was heightened awareness about the HIV virus, only two or three percent of the patients requiring emergent surgical procedures refused treatment, even prior to the commercial availability of tests to detect the HIV virus in blood.

Although sympathetic to Plaintiff's plight and the terrible emotional trauma inflicted by this disease, this Court has great difficulty giving much weight to Mr. Knight's post-surgical testimony that he would have refused surgery. In May 1984, Mr. Knight was facing the high probability of death at age 64 from his heart condition. Furthermore, the evidence established only a strong, though not conclusive, suspicion that the HIV virus could be transmitted through blood or blood products. Comparing the rather high probability of death from certain coronary disease to the strong suspicion of contracting the HIV virus, a reasonable person would have little choice but to choose surgery.

■ Accordingly, the Court finds that a reasonable person, faced with Mr. Knight's dilemma and informed of the remote, though deadly consequences of HIV virus and its possible transmission through blood transfusion, would not have refused the

 

bypass surgery performed on May 22, 1984.

### (3) *Duty to Disclose Autologous or Directed–Blood Programs*

■ Alternatively, Plaintiff suggests that Defendant was also negligent in failing to advise him of the availability of autologous or directed-blood donation programs. The evidence conclusively established that Mr. Knight was not a candidate for autologous blood transfusion given his serious and life-threatening cardiac condition. Dr. Trinkle testified that autologous blood transfusion on Mr. Knight might have precipitated cardiac arrest, and he testified that he would never had recommended such a transfusion. Even Mr. Knight testified that he would not have consented to an autologous blood transfusion. Based on this evidence, this Court finds that Defendant was not negligent in failing to advise Plaintiff of the availability of autologous blood transfusions.

■ With regards to the possibility of receiving directed blood donations, Dr. O'Connell testified that it would have been the accepted standard of care to advise patients of such types of donations if, and only if, a program of directed blood donations was available at BAMC. No evidence suggested that BAMC had any type of directed blood program in 1984. Furthermore, Dr. Trinkle testified that there would have been no way of conclusively establishing whether any directed blood donations would have lowered the risk of the blood being contaminated. No other testimony was presented on this issue and, thus, the Court finds insufficient evidence to establish that Defendant had a duty to inform Mr. Knight of the directed blood donation option. Accordingly, the Court holds Defendant was not negligent in failing to advise Plaintiff of the availability of directed blood donations.

Based on the Court's Findings of Fact and Conclusions of Law, the Court holds that Plaintiff should take nothing from Defendant.

Judgment will be entered for Defendant.

IT IS SO ORDERED.